# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

STATE OF CALIFORNIA, ET AL.,

*Defendants-Appellees.*

———————————

On Appeal from the U.S. District Court for the Eastern
District of California, No. 2:18-cv-00490-JAM-KJN
Hon. John A. Mendez, Judge

———————————

## ANSWERING BRIEF

———————————

XAVIER BECERRA
  *Attorney General of California*
EDWARD C. DUMONT
  *Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
AIMEE FEINBERG
  *Deputy Solicitor General*
SATOSHI YANAI
ANTHONY HAKL
CHRISTINE CHUANG
  *Supervising Deputy Attorneys General*

CHEROKEE DM MELTON
MAUREEN C. ONYEAGBAKO
LEE I. SHERMAN
  *Deputy Attorneys General*
KRISTIN LISKA
  *Associate Deputy Solicitor General*
CALIFORNIA DEPARTMENT OF JUSTICE
1300 I Street, Suite 125
Sacramento, CA 94244-2550
(916) 210-6003
Aimee.Feinberg@doj.ca.gov
*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................. 1

Statement of Issues ...................................................................................... 3

Statement of Jurisdiction ............................................................................. 4

Statement of the Case .................................................................................. 5

I.      Statutory Background ...................................................................... 5

        A.      Federal Regulation of Immigration ...................................... 5

        B.      State Regulation of Law Enforcement and Private Employers ............ 8

                1.      Regulation of State and Local Law Enforcement ...................... 8

                2.      Regulation of Local Detention Facilities ................................. 12

                3.      Regulation of the Employer-Employee Relationship .............. 13

II.     Procedural Background ................................................................. 16

Summary of Argument ............................................................................... 19

Standard of Review ..................................................................................... 23

Argument ..................................................................................................... 24

I.      California's Decision to Limit Some Forms of Assistance to
        Immigration Enforcement Efforts Complies with Federal Law (Senate
        Bill 54) ........................................................................................... 24

        A.      The INA Does Not Preempt SB 54 ..................................... 24

                1.      The INA Does Not Expressly Preempt SB 54's
                        Information-Sharing Provisions .............................. 25

                2.      The INA Does Not Impliedly Preempt SB 54's
                        Provisions Addressing Information Sharing or Transfers
                        of Individuals to Immigration Custody ..................... 29

        B.      Reading the INA to Prohibit California from Declining to
                Participate in Immigration Enforcement Would Create Serious
                Constitutional Concerns ...................................................... 35

        C.      SB 54 Does Not Compromise the Federal Government's
                Immunity from State Regulation .......................................... 42

II.   Federal Law Does Not Deprive the California Attorney General of
      Authority to Inspect In-State Detention Facilities (Assembly Bill 103).......44

      A.    The INA Does Not Preempt AB 103 ................................................45

      B.    AB 103 Does Not Discriminate Against the Federal
            Government ........................................................................................50

III.  California's Employee Notice Requirements Are Consistent with
      Federal Law (Assembly Bill 450) ..................................................53

      A.    Federal Law Does Not Preempt AB 450's Notice Provisions............53

      B.    AB 450's Notice Provisions Do Not Conflict with Principles of
            Intergovernmental Immunity............................................................58

IV.   A Preliminary Injunction Is Not in the Public Interest...................................60

Conclusion ..............................................................................................62

# TABLE OF AUTHORITIES

**Page**

CASES

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) ...............................................23, 24, 60

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
  __ U.S. ___, 135 S. Ct. 2652 (2015).................................................39

*Arizona v. United States*,
  567 U.S. 387 (2012).............................................................passim

*Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*,
  868 F.2d 1085 (9th Cir. 1989) .....................................................60

*Boeing Co. v. Movassaghi*,
  768 F.3d 832 (9th Cir. 2014) ...................................................42, 58

*Bond v. United States*,
  572 U.S. 844 (2014)................................................................42

*Bounds v. Smith*,
  430 U.S. 817 (1977)................................................................46

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001)................................................................56

*Chamber of Commerce of U.S. v. Whiting*,
  563 U.S. 582 (2011)........................................................28, 54, 56

*City & Cty. of San Francisco v. Sessions*,
  No. 17-cv-4642, 2018 WL 4859528 (N.D. Cal. Oct. 5, 2018)..............25, 28, 38

*City of Chicago v. Sessions*,
  321 F. Supp. 3d 855 (N.D. Ill. 2018)...............................................38

*City of Chicago v. Sessions*,
  888 F.3d 272 (7th Cir. 2018) ......................................................29

# TABLE OF AUTHORITIES
## (continued)

Page

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018) ....................................................... 33

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999) ........................................................ 38

*City of Philadelphia v. Sessions*,
309 F. Supp. 3d 289 (E.D. Pa. 2018) ................................... 25, 38

*Cornett v. Donovan*,
51 F.3d 894 (9th Cir. 1995) ....................................................... 46

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .................................................................. 56

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989) ............................................... 42, 43, 44, 53

*De Canas v. Bica*,
424 U.S. 351 (1976) .................................................................... 5

*Doe v. Kelly*,
878 F.3d 710 (9th Cir. 2017) ..................................................... 53

*Galarza v. Szalczyk*,
745 F.3d 634 (3d Cir. 2014) ...................................................... 33

*Gartrell Constr., Inc. v. Aubry*,
940 F.2d 437 (9th Cir. 1991) ..................................................... 46

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ................................................................... 42

*Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*,
452 U.S. 264 (1981) ................................................................... 40

*In re Neagle*,
135 U.S. 1 (1890) ....................................................................... 48

*Jones v. Blanas*,
   393 F.3d 918 (9th Cir. 2004) ................................................53

*Lamar, Archer & Cofrin, LLP v. Appling*,
   __ U.S. __, 138 S. Ct. 1752 (2018) ....................................27

*Leslie Miller, Inc. v. Arkansas*,
   352 U.S. 187 (1956) (per curiam).......................................46

*Madeira v. Affordable Hous. Found., Inc.*,
   469 F.3d 219 (2d Cir. 2006) ...............................................55

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
   __ U.S.__, 138 S. Ct. 1461 (2018).............................passim

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
   514 U.S. 645 (1995)............................................................27

*Nash v. Fla. Indus. Comm'n*,
   389 U.S. 235 (1967)............................................................56

*New York v. United States*,
   505 U.S. 144 (1992)......................................35, 36, 37, 42

*North Dakota v. United States*,
   495 U.S. 423 (1990)...................................... 42, 44, 50

*Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Admin.*,
   860 F.3d 1228 (9th Cir. 2017) .....................................32, 41

*Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*,
   361 U.S. 376 (1960)......................................................50, 58

*Printz v. United States*,
   521 U.S. 898 (1997)...........................28, 35, 36, 37, 40

*Reno v. Condon*,
  528 U.S. 141 (2000)............................................................41

*Salas v. Sierra Chem. Co.*,
  59 Cal. 4th 407 (2014) ......................................................14

*Tarble's Case*,
  80 U.S. 397 (1871)............................................................48

*United States v. Arizona*,
  641 F.3d 339 (9th Cir. 2011) .............................................60

*United States v. City of Arcata*,
  629 F.3d 986 (9th Cir. 2010) .............................................58

*United States v. Lewis Cty.*,
  175 F.3d 671 (9th Cir. 1999) .............................................43

*United States v. Nye Cty.*,
  178 F.3d 1080 (9th Cir. 1999) ...........................................50

*United States v. You*,
  382 F.3d 958 (9th Cir. 2004) .............................................33

*Washington v. United States*,
  460 U.S. 536 (1983)...........................................................50

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)........................................................23, 60

*Wis. Pub. Intervenor v. Mortier*,
  501 U.S. 597 (1991)...........................................................39

STATUTES AND REGULATIONS

United States Code, Title 8

§ 1103(a)........................................................................6, 45
§ 1151(a)...............................................................................5
§ 1151(b).............................................................................25
§ 1159(b).............................................................................25
§ 1181...................................................................................5
§ 1182.................................................................................27
§ 1226...................................................................................5
§ 1226(a).............................................................................31
§ 1226(c)........................................................................29, 31
§ 1226(d).............................................................................31
§ 1227(a).............................................................................31
§ 1231...................................................................................5
§ 1231(a).............................................................................31
§ 1231(g)........................................................................6, 45
§ 1252c(a).......................................................................6, 33
§ 1255.................................................................................25
§ 1324(a).............................................................................33
§ 1324a...........................................................................7, 53
§ 1357(d)........................................................................6, 32
§ 1357(g)....................................................................6, 26, 33
§ 1360(a).............................................................................26
§ 1360(b).............................................................................26
§ 1360(c).............................................................................26
§ 1367(a).............................................................................26
§ 1372(c).............................................................................27
§ 1373...........................................................................passim
§ 1373(a)....................................................................7, 25, 31
§ 1373(b)...............................................................................7
§ 1373(c).............................................................................31
§ 1375a(c)...........................................................................27
§ 1375a(e)...........................................................................27
§ 1644...........................................................................7, 28

# TABLE OF AUTHORITIES
## (continued)

United States Code, Title 28

§ 1292(a)(1) ................................................................................4
§ 1331 ........................................................................................4
§ 1345 ........................................................................................4

Code of Federal Regulations, Title 8

§ 236.6 ...............................................................................48, 49
§ 274a.2 ................................................................................7, 53
§ 274a.2(b) ...........................................................................7, 54
§ 287.5(e)(3) ..............................................................................32
§ 287.7(a) .............................................................................6, 32

California Government Code

§ 7282.5(a) .....................................................................10, 11, 29
§ 7282.5(b) ................................................................................11
§ 7284.2(b) ..................................................................................9
§ 7284.2(c) ..................................................................................9
§ 7284.2(d) ..................................................................................9
§ 7284.2(f) ................................................................................12
§ 7284.4(a) ...........................................................................10, 11
§ 7284.4(c) ................................................................................43
§ 7284.6(a) ...........................................................................10, 11
§ 7284.6(b) ................................................................................11
§ 7284.6(e) ...........................................................................12, 25
§ 11183 .....................................................................................49
§ 12532 .....................................................................................13
§ 12532(b) .................................................................13, 46, 47
§ 12532(c) .................................................................................13

California Labor Code

§ 90.2(a) ...........................................................................15, 57
§ 90.2(b) ...........................................................................15, 57
§ 90.2(c) ...........................................................................15, 57
§ 230.1(h) ................................................................................14
§ 2810.5 ...................................................................................14
§ 6300 ......................................................................................14
§ 6328 ......................................................................................14

California Penal Code

§ 422.93(a) ................................................................................8
§ 422.93(b) ................................................................................8
§ 4000 .....................................................................................12
§ 4013 .....................................................................................51
§ 4015 .....................................................................................51
§ 4017 .....................................................................................51
§ 4018.1 ..................................................................................51
§ 4019.5 ..................................................................................51
§ 4021 .....................................................................................51
§ 4023 .....................................................................................51
§ 4030 .....................................................................................51
§ 4032 .....................................................................................51
§ 6031 ..........................................................................12, 13, 51
§ 6031.1 .......................................................................12, 13, 51
§ 6031.1(a) .......................................................................13, 51
§ 6031.1(c) ..............................................................................51
§ 6031.4 ...........................................................................12, 52

California Session Laws

Stats. 2013, ch. 570 ..................................................................8
Stats. 2016, ch. 768 ..................................................................8
Stats. 2017, ch. 17 ..............................................................12, 13

California Code of Regulations, Title 15
  §§ 1000-1282 ...................................................................................12
  § 1041.............................................................................................51
  § 1063.............................................................................................51
  § 1064.............................................................................................51
  § 1068.............................................................................................51

CONSTITUTIONAL PROVISIONS

U.S. Const., amend. X.........................................................................5

COURT RULES

Fed. R. App. P. 4(a)(1)(B)(i)..............................................................4

OTHER AUTHORITIES

68 Fed. Reg. 4364 (Jan. 29, 2003) ....................................................49

75 Op. Cal. Att'y Gen. 270 (1992) ....................................................28

American Immigration Council, Fact Sheet: Immigrants in California
  (Oct. 4, 2017). ...............................................................................14

Assemb. Comm. on Labor & Emp't Rep., AB 450 (Apr. 19, 2017)......................14

Assemb. Comm. on Pub. Safety Rep., SB 54 (June 13, 2017).................9

Board of State and Community Corrections, List of Statewide Local
  Detention Facilities ........................................................................52

H.R. Rep. No. 99-682 (1986).............................................................57

H.R. Rep. No. 104-725 (1996)...........................................................28

Office of Special Counsel for Immigration-Related Unfair
  Employment Practices, U.S. Department of Justice, Civil Rights
  Division, Employer Best Practices During Worksite Enforcement
  Audits ............................................................................................56

**TABLE OF AUTHORITIES**
**(continued)**

Page

Sen. Judic. Comm. Rep., AB 450 (July 11, 2017)....................................................14

U.S. Dep't of Homeland Security, Warrant for Arrest of Alien, Form
    I-200 (Rev. 09/16)................................................................................32

U.S. Immigration and Customs Enforcement, Fact Sheet: Form I-9
    Inspection Overview (Jan. 8, 2018)....................................................55

## INTRODUCTION

The Constitution gives the federal government the power to set the legal rules governing how non-citizens may enter and remain in the United States. In enforcing those rules, the United States may set its own priorities and direct the activities of its officers and the use of its own resources.

This authority over immigration matters does not give the federal government any corresponding power to control state or local officials, or to dictate how California uses *state* resources. Nor does it divest California of its sovereign authority to, for example, review conditions in detention facilities within its jurisdiction or regulate employment in the State. The district court correctly rejected the United States' motion to enjoin three California laws addressing these issues of state concern.

Senate Bill 54 defines circumstances under which state and local law enforcement officials may use public resources to assist in immigration enforcement. It promotes trust between local officials and the communities they serve, and encourages victims and witnesses to report crimes without fear of immigration enforcement as a result. It also preserves state resources for activities the Legislature determined would best protect public safety. Notably, it permits substantial cooperation with immigration officers in certain circumstances, such as when enforcement efforts are directed at individuals who have been convicted of

1

serious or violent felonies.  In other circumstances, it simply directs state and local officials to let federal officers use their own resources to do their own work.

The United States challenges SB 54's restrictions on communicating release dates, on sharing home and work addresses, and on transferring non-violent individuals to immigration custody.  But its challenge rests on the erroneous premise that deciding not to commit state resources to assisting some federal enforcement efforts is the same as interfering with those efforts.  Federal enforcement policies might of course be furthered if state and local governments could be forced to contribute their resources to the federal cause.  But as the district court correctly recognized, declining to assist with some federal activities is not the same as standing in the way.

Assembly Bill 103 directs the California Attorney General to inspect facilities housing civil immigration detainees.  The United States concedes that States may properly apply their general health, safety, and inspection standards to facilities holding a civil immigration population.  Its argument that AB 103 oversteps that authority misunderstands California's law.  AB 103 provides for the collection of facts; it does not interfere with any federal arrest, detention, or removal decision.

Assembly Bill 450 simply requires an employer to pass along to its employees certain notices that the employer itself receives, under federal law, regarding federal inspections of records documenting employees' legal ability to

work.  In this case, the United States argues that such notices impede its workplace audits; but that can hardly be the case when the government itself advises employers to provide similar notices to their workers.  Nor does AB 450 single out federal activities for unfavorable treatment.  The law regulates California employers and their interactions with California employees.  It does not insert the State into, or differentially burden, any federal contract or federal function.

In adopting SB 54, AB 103, and AB 450, California has acted to preserve state resources for state priorities and to safeguard the health and welfare of state residents.  Nothing in the Constitution or federal immigration law divests the State of the authority to make those choices.

## STATEMENT OF ISSUES

1.    Whether the federal Immigration and Nationality Act (INA) expressly or impliedly preempts a California statute that limits certain forms of assistance that state and local law enforcement officials may provide with respect to enforcement of federal immigration law, while authorizing numerous forms of cooperation, including the provision of information regarding citizenship and immigration status.

2.    Whether a federal statute compelling California to assist with immigration enforcement efforts would violate the constitutional prohibition on federal commandeering of States' executive and legislative activities.

3.     Whether principles of intergovernmental immunity preclude California from declining to assist in enforcing federal immigration law.

4.     Whether a California statute authorizing inspections of local facilities housing civil immigration detainees is impliedly preempted by the INA or discriminates against federal functions in violation of principles of intergovernmental immunity.

5.     Whether a California statute generally requiring employers to inform employees when they receive notices of federal inspections of employment authorization records is impliedly preempted by the INA or discriminates against federal functions in violation of principles of intergovernmental immunity.

6.     Whether enjoining California's laws during the pendency of this litigation is equitable and in the public interest.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345.  The district court entered an order granting in part and denying in part the United States' motion for a preliminary injunction.  Excerpts of Record 8-67.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).  The district court's preliminary injunction order was entered on July 5, 2018.  ER 67, 552.  The United States timely filed its notice of appeal on August 7, 2018.  ER 68-69; *see* Fed. R. App. P. 4(a)(1)(B)(i).

# STATEMENT OF THE CASE

## I. STATUTORY BACKGROUND

### A. Federal Regulation of Immigration

The federal government has broad constitutional authority to regulate immigration. *Arizona v. United States*, 567 U.S. 387, 394-395 (2012). In general, the national government is entitled to determine "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *De Canas v. Bica*, 424 U.S. 351, 355 (1976); *see also Arizona*, 567 U.S. at 394-397. The Constitution also contains limits on the federal government's exercise of this authority. *See, e.g.*, U.S. Const., amend. X.

The federal Immigration and Nationality Act, as amended by the 1986 Immigration Reform and Control Act and the 1996 Illegal Immigration Reform and Immigrant Responsibility Act (INA), comprehensively regulates these matters. It prescribes detailed criteria for admission to the United States, sets qualifications for different immigration statuses, establishes when persons without legal status may or must be detained, and creates an administrative and enforcement apparatus for detaining and removing non-citizens from the country. *E.g.*, 8 U.S.C. §§ 1151(a), 1181, 1226, 1231. The federal Immigration and Customs Enforcement agency, which is part of the Department of Homeland Security, is responsible for identifying, apprehending, and removing those unlawfully in the country. *Arizona*, 567 U.S. at 397.

The INA permits state involvement in these federal enforcement efforts under specified circumstances. *See Arizona*, 567 U.S. at 408-410. For example, States and localities may, "to the extent consistent with State and local law," enter into formal agreements with the United States to assume the responsibilities of federal immigration officers, subject to federal direction and supervision. 8 U.S.C. § 1357(g)(1), (3), (9). State and local law enforcement officials may, "to the extent permitted by relevant State and local law," arrest and detain certain undocumented immigrants with prior felony convictions until ICE assumes custody. *Id.* § 1252c(a). And federal officials may enter into contracts with state and local entities to house individuals detained for federal immigration purposes. *Id.* §§ 1103(a)(11), 1231(g).

The INA also permits federal officials to request specific forms of assistance from States to facilitate the federal detention of individuals in state criminal custody. Federal agents may ask, but not compel, state and local officers to provide advance notice of when an individual will be released from jail or prison. *See Arizona*, 567 U.S. at 410 (citing 8 U.S.C. § 1357(d)). ICE implements this authority by issuing "detainer requests," which "request[] that [a state or local law enforcement] agency advise [DHS], prior to release of [an] alien, in order for [DHS] to arrange to assume custody.…" 8 C.F.R. § 287.7(a).

The INA, on its face, requires States to permit one specific form of assistance. Section 1373 provides that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see also id.* §§ 1373(b), 1644 (similar).

Finally, the INA regulates the employment of undocumented workers. It is illegal for employers to knowingly hire or employ individuals who lack legal authorization. 8 U.S.C. § 1324a(a). This prohibition is enforced through criminal and civil penalties. *Arizona*, 567 U.S. at 404. No similar criminal sanction applies to individuals who work without documentation. *Id.* Employers must complete a Form I-9, which demonstrates an employee's lawful work status, for each new employee and retain the forms for prescribed periods. 8 U.S.C. § 1324a(b); 8 C.F.R. § 274a.2. Federal immigration authorities are entitled to inspect those forms, but only after at least three business days' notice to the employer. 8 C.F.R. § 274a.2(b)(2)(ii).

## B. State Regulation of Law Enforcement and Private Employers

### 1. Regulation of State and Local Law Enforcement

California and its localities have long recognized that victims and witnesses of crime are less likely to come forward if they fear that an interaction with law enforcement will lead to their removal or the removal of a family member. In 2004, the Legislature addressed this concern by restricting peace officers from detaining, for suspected immigration violations, victims of or witnesses to hate crimes who were not themselves charged with a state criminal offense. Cal. Penal Code § 422.93(a), (b). Similarly, in 2013, the Legislature limited the circumstances under which local law enforcement officials could detain individuals at the request of federal immigration authorities. Stats. 2013, ch. 570 (AB 4); *see also* Stats. 2016, ch. 768 (AB 2792) (adopting standards for local law enforcement officials to increase transparency about their involvement in immigration enforcement).

In 2017, the Legislature enacted Senate Bill 54, the California Values Act, to further define the circumstances under which state and local law enforcement may participate in immigration enforcement activities. The Legislature passed this measure against the backdrop of significant changes in the federal government's approach to immigration enforcement. The Legislature recognized that, in early 2017, the United States adopted a new enforcement strategy that included an

expansion of deportation efforts and plans to rely on local law enforcement as
"'force multipliers.'"  Assemb. Comm. on Pub. Safety Rep., SB 54 (June 13,
2017), at 7 (discussing author's statement).  The shift in federal immigration
priorities amplified concerns that victims and witnesses would not report state
crimes.  The Legislature was confronted with a report that, in Los Angeles, reports
of sexual assault dropped by 25% in early 2017 and reports of domestic violence
by 10% among the city's Latino population as compared with the same period the
prior year.  *Id.*

Based on this information, the Legislature found that the "relationship of trust
between California's immigrant community and state and local agencies is central
to the public safety of the people of California" and that such trust is threatened
when state and local agencies participate in immigration enforcement.  Cal. Gov't
Code § 7284.2(b), (c).  State and local involvement in immigration efforts causes
immigrant residents to "fear approaching police when they are victims of, and
witnesses to, crimes, seeking basic health services, or attending school,"
jeopardizing the health, safety, and well-being of all Californians.  *Id.* § 7284.2(c).
The Legislature further found that state and local engagement in immigration
enforcement "diverts already limited resources and blurs the lines of accountability
between local, state, and federal governments."  *Id.* § 7284.2(d).

SB 54 generally prohibits state and local law enforcement agencies from using public funds or personnel "to investigate, interrogate, detain, detect, or arrest persons for immigration enforcement purposes." Cal. Gov't Code § 7284.6(a)(1); *see also id.* § 7284.4(a) (defining covered law enforcement agencies). Among other things, it bars law enforcement officials from asking individuals about their immigration status, making arrests based on civil immigration warrants, and detaining individuals on the basis of an immigration hold request. *Id.* § 7284.6(a)(1)(A), (B), (E).

The three provisions of SB 54 at issue in this appeal involve restrictions on facilitating inmate transfers to immigration custody and on communicating release dates and address information. First, SB 54 precludes state and local officials from transferring an individual to immigration authorities unless authorized by a judicial warrant or a judicial probable cause determination, or unless the individual has been convicted of one of hundreds of serious or violent felonies or any felony punishable by state imprisonment. Cal. Gov't Code §§ 7284.6(a)(4), 7282.5(a). Second, SB 54 says that law enforcement agencies may not provide immigration authorities a person's date of release from state or local custody, unless that information is available to the public, the person has been convicted of any of the same set of criminal offenses, or if the person has been arrested for one of numerous specified felonies and a magistrate finds the charge is supported by

probable cause.  *Id.* §§ 7284.6(a)(1)(C), 7282.5(a), (b).  Third, a law enforcement agency may not provide to immigration authorities personal information about an individual, including the individual's home and work address, unless the information is publicly available.  *Id.* § 7284.6(a)(1)(D).

SB 54 does not limit participation in many immigration-related activities.  For example, none of its restrictions apply to the California Department of Corrections and Rehabilitation, which operates the state prison system.  Cal. Gov't Code § 7284.4(a).  Thus, the law does not restrict the State from providing release dates or transferring inmates when a term of state imprisonment concludes.  SB 54 also permits state and local law enforcement officials to allow immigration authorities to access criminal history information in the State's law enforcement databases (*id.* § 7284.6(b)(2); *see also* Supplemental Excerpts of Record 62 (¶¶ 10-13)); to investigate and detain individuals on reasonable suspicion of illegally re-entering the United States after commission of an aggravated felony, if that violation is detected during unrelated law enforcement activity (Cal. Gov't Code § 7284.6(b)(1)); to give immigration authorities access to detention facilities to interview individuals in criminal custody (*id.* § 7284.6(b)(5)); and to participate in joint task forces whose primary purpose is unrelated to immigration enforcement (*id.* § 7284.6(b)(3); *see also* SER 68 (¶ 13)).  Likewise, SB 54 "does not prohibit or restrict any government entity or official from sending to, or receiving from,

11

federal immigration authorities, information regarding the citizenship or

immigration status, lawful or unlawful, of an individual … or maintaining or

exchanging that information with any other federal, state, or local government

entity, pursuant to Sections 1373 and 1644 of Title 8 of the United States Code."

Cal. Gov't Code § 7284.6(e).  The balance the Legislature struck in permitting

some, but not all, forms of assistance to immigration enforcement efforts was

designed "to ensure effective policing, to protect the safety, well-being, and

constitutional rights of the people of California, and to direct the state's limited

resources to matters of greatest concern to state and local governments."  *Id.*

§ 7284.2(f).

### 2. Regulation of Local Detention Facilities

California law regulates conditions in local detention facilities housing

individuals held under the authority of state criminal law.  *See, e.g.*, Cal. Penal

Code §§ 4000 *et seq.*  It also empowers the Board of State and Community

Corrections to establish minimum standards and inspect those facilities for

compliance.  *Id.* §§ 6031, 6031.1, 6031.4; Cal. Code Regs. tit. 15, §§ 1000-1282.

In 2017, the Legislature adopted an omnibus public safety law, Assembly

Bill 103, to address a range of criminal justice and judicial policy issues.

Stats. 2017, ch. 17 (AB 103).  Among other things, the bill authorized the Board to

inspect local detention facilities more frequently, added new required subjects of

inspection, and mandated that Board inspection reports be made available to the public.  *Id.* §§ 42, 43, codified at Cal. Penal Code §§ 6031, 6031.1.  As amended by AB 103, state law requires the Board to inspect facilities for compliance with a broad range of minimum confinement standards at least every two years.  Cal. Penal Code § 6031.1(a).

AB 103 also authorized reviews of locked detention facilities in the State that house non-citizens for purposes of civil immigration proceedings.  Cal. Gov't Code § 12532.  The law requires the California Attorney General, by March 1, 2019, to review county, local, or private locked detention facilities holding such individuals, examining "the conditions of confinement," "the standard of care and due process provided to" civil immigration detainees, and "the circumstances around their apprehension and transfer to the facility."  *Id.* § 12532(b)(1).  "The Attorney General … shall be provided all necessary access for the observations necessary to effectuate reviews required pursuant to this section, including, but not limited to, access to detainees, officials, personnel, and records."  *Id.* § 12532(c).  The Attorney General must publicly report findings from this review.  *Id.* § 12532(b)(2).

### 3.    Regulation of the Employer-Employee Relationship

California law codifies robust protections for workers.  *See, e.g.*, Cal. Lab. Code §§ 6300 *et seq.*  State law helps employees enforce these protections by,

among other things, requiring employers to notify workers of their rights.  *E.g.*, *id.* §§ 230.1(h), 2810.5, 6328.

In California, immigrants make up a substantial portion of the State's workforce.  American Immigration Council, Fact Sheet: Immigrants in California (Oct. 4, 2017).[1]  The majority of immigrants working in California are legally authorized to do so.  *See id.*  State law recognizes that the workplace is fairer for all employees when worker protections apply to the entire labor force, irrespective of immigration status.  *Cf. Salas v. Sierra Chem. Co.*, 59 Cal. 4th 407, 418-420, 426 (2014).

Against this backdrop, the Legislature recognized that, in early 2017, the change in federal immigration enforcement policies was likely to lead to more frequent enforcement actions at workplaces in the State.  ER 179 (Sen. Judic. Comm. Rep., AB 450 (July 11, 2017)).  The Legislature had before it reports that such actions chill employees' ability to exercise employment rights and create opportunities for unscrupulous employers to exploit workers who might be afraid to complain and prompt the summoning of enforcement officers.  *See* Assemb. Comm. on Labor & Emp't Rep., AB 450 (Apr. 19, 2017), at 3.  Legislators also observed that employers responding to immigration enforcement activity

---

[1] Available at https://www.americanimmigrationcouncil.org/research/immigrants-in-california (last visited Oct. 30, 2018).

sometimes take adverse actions against employees, including termination, that are either unnecessary to comply with federal law or, in some cases, illegal. ER 180.

In response to these concerns, the Legislature adopted Assembly Bill 450. As relevant here, the statute requires employers, "[e]xcept as otherwise required by federal law," to post a notice informing employees of inspections of I-9 forms or other employment records within 72 hours of receiving notice of the inspection. Cal. Lab. Code § 90.2(a)(1); *see also id.* § 90.2(a)(1)(A)-(D) (requirements for content of notice). The statute also requires an employer, "[e]xcept as otherwise required by federal law," to provide affected employees and any employee union, within 72 hours of receipt, a copy of any written notice received from immigration authorities stating the results of the inspection and notice of any obligations of the employer and affected employee growing out of the inspection. *Id.* § 90.2(b)(1); *see also id.* § 90.2(b)(2) (affected employee is person identified as potentially lacking work authorization or adequate documentation); *id.* § 90.2(b)(1)(A)-(D) (requirements for content of post-inspection notices). Employers that fail to give the required notices are subject to civil penalties, but the statute "does not require a penalty to be imposed" if the failure to provide notice was "at the express and specific direction or request of the federal government." *Id.* § 90.2(c). The statute ensures that "workers have sufficient notice and opportunity to correct any

15

inaccuracies in their employment eligibility records before employers take adverse action against them in connection with immigration enforcement audits." ER 179.

## II. PROCEDURAL BACKGROUND

In March 2018, the United States sued California, the Governor, and the state Attorney General, alleging that aspects of SB 54, AB 103, and AB 450 are preempted and violate the Supremacy Clause. ER 520-537. The United States also moved to enjoin each of the challenged provisions pending completion of the litigation. ER 8.

The district court granted the motion for a preliminary injunction in part and denied it in part. ER 8-67. The court concluded that the United States was not likely to succeed on its claim that federal law expressly or impliedly preempts SB 54. ER 39-62. The court determined that SB 54's limitations on providing release dates and home and work addresses to immigration officers do not conflict with 8 U.S.C. § 1373, which addresses the communication of information regarding citizenship or immigration status. ER 39-49. SB 54 expressly permits such information to be shared. ER 44-46. Further, section 1373's "plain meaning … limits its reach to information strictly pertaining to immigration status (i.e. what one's immigration status is)." ER 46. "While an immigrant's release date or home address might assist immigration enforcement officers in their endeavors, neither

of these pieces of information have any bearing on one's immigration or citizenship status." ER 46-47.

The court was also unpersuaded by the United States' claim that SB 54 stands as an obstacle to the achievement of the purposes of federal immigration law. ER 49-62. The court explained that "[f]ederal objectives will always be furthered if states offer to assist federal efforts." *Id.* at 50. Conversely, a "state's decision not to assist in [federal enforcement] activities will always make the federal object more difficult to attain than it would be otherwise." *Id.* But "[s]tanding aside does not equate to standing in the way." *Id.*

The court further concluded that Tenth Amendment and anti-commandeering principles counsel against preemption. ER 55. Because the United States may not compel state officers to perform tasks in the service of a federal program, "it is highly unlikely that Congress could have made responses to requests seeking information and/or transfers of custody mandatory." *Id.* Moreover, a "Congressional mandate prohibiting states from restricting their law enforcement agencies' involvement in immigration enforcement activities—apart from, perhaps, a narrowly drawn information sharing provision—would likely violate the Tenth Amendment." ER 59.

The court also held that SB 54 likely does not conflict with the intergovernmental immunity doctrine. ER 62-64. The court was "not convinced"

that the doctrine applies to a State's decision to limit its own cooperation with federal efforts. ER 63. In any event, the United States failed to show that California's law uniquely burdens federal immigration authorities. *Id.* Moreover, any differential treatment would be justified by California's legitimate choice to focus its resources elsewhere. ER 63-64.

The court also determined that the United States was not likely to prevail on its challenge to AB 103, regarding inspections of in-state detention facilities. ER 19-26. The statute "directs the Attorney General to channel an authority he already wields" to review facilities and issue a report. ER 22. It "does not purport to give California a role in determining whether an immigrant should be detained or removed from the country." ER 21. With respect to principles of intergovernmental immunity, the court explained that, even if AB 103 treats federal contractors differently than the State treats other detention facilities covered by the State's generally applicable inspection scheme, the United States failed to show that California "treats other facilities better than those contractors." ER 26.

Finally, the court held that the United States was unlikely to succeed on its challenge to AB 450's requirement that employers give their employees notice of federal work-authorization audits. ER 33-35. (The court held that the United States was likely to prevail on its challenge to three other aspects of the law.

ER 29-33, 35-38.) Given federal law's "focus on employers, the Court finds no indication—express or implied—that Congress intended for employees to be kept in the dark." ER 35. The statute's notice provisions likewise do not violate the intergovernmental immunity doctrine, because they "do not turn on the employer's choice to 'deal with' … federal law enforcement." *Id.* (non-compliant employer penalized for "failure to communicate with its employees," not for "its choice to work with the Federal Government").

Based on these conclusions, the district court largely denied the United States' motion for a preliminary injunction. ER 67. The court also granted in part and denied in part California's motion to dismiss the complaint. ER 1-7.

## SUMMARY OF ARGUMENT

Each of the challenged provisions of California law is a valid exercise of the State's regulatory authority.

*Senate Bill 54.* California's decision in SB 54 to limit the circumstances under which state and local officials may provide release dates and address information, and may assist in transferring individuals to federal custody, is neither expressly nor impliedly preempted by the INA. Section 1373 of the INA requires States to allow state and local officials to share "information regarding … citizenship or immigration status" with federal officers. SB 54 expressly permits such sharing. Section 1373 does not extend to release dates and address

information.  Information regarding citizenship or immigration status concerns a person's category of presence; the phrase cannot naturally be read to encompass any fact that may assist immigration officials in determining whether an individual may be detained or removed, as the United States asserts.

SB 54 likewise does not interfere with federal enforcement activities.  SB 54 authorizes substantial assistance to immigration enforcement efforts, particularly when it comes to detaining individuals who pose a threat to public safety.  In those areas where SB 54 does limit aid, the district court correctly recognized that refraining from assisting in immigration enforcement is not the same as standing in the way.

The United States gleans from the INA a congressional "assumption" that States must help federal officials carry out detentions and removals as soon as state criminal jurisdiction concludes.  But any decision to deprive California of its power to regulate the use of its own law enforcement resources would have to be based on a clear and manifest congressional purpose, not a vague "assumption." Nothing in the INA requires States to help discharge the enforcement duties that Congress assigned to federal officers.

Reading the INA to contain such a requirement—or to restrict California's ability to define and limit the discretion of its state and local officials to engage in immigration enforcement matters—would violate the principle that the federal

government may not commandeer States or their officers to implement a federal program. The Court should construe the INA to avoid any such constitutional infirmity.

SB 54 also does not compromise the United States' immunity from discriminatory state regulation of its activities. If the United States could re-cast a State's decision to decline to implement a federal program as unconstitutional discrimination, there would be nothing left of the anti-commandeering doctrine.

*AB 103.* Neither the INA nor principles of intergovernmental immunity preclude the California Attorney General from reviewing conditions in detention facilities housing immigration detainees within the State. The INA allows the federal government to contract with state and local entities to house civil immigration detainees. That basic contracting authorization reflects no intent— and certainly not the clear and manifest intent necessary to displace state law—to deprive States of their authority to assure the health and welfare of individuals within their borders, including those in detention. Indeed, the United States does not dispute that States have concurrent jurisdiction to apply general state requirements on local immigration detention facilities.

The United States claims that AB 103's provision for a review of the standards of due process provided and the circumstances of detainees' apprehension and transfer intrudes on federal detention and removal decisions.

The statutory language concerning "due process provided" directs an inquiry into conditions of confinement as they bear on detainees' access to courts—not a review of ICE removal proceedings. The statute's provision concerning circumstances of apprehension and transfer authorizes a review of facts leading to a detainee's arrest and detention, including by federal agents. The mere collection of such facts cannot be compared to a State ordering the release of individuals in federal custody, as the United States urges.

AB 103 also does not impermissibly discriminate against the federal government or those with whom it deals. Any local facility subject to both the State's general inspection scheme and AB 103 reviews is operated by a county government. Thus, any added "burden" of AB 103 reviews falls most directly on the State's own political subdivisions. That fact belies any claim of discrimination against the United States.

*AB 450.* California's employee notice provisions are consistent with federal law. The INA does not bar employers from passing along to employees notice of federal I-9 inspections received by the employers. On the contrary, the federal government itself advises employers to furnish notices to their employees under similar circumstances.

AB 450 also does not impose disparate burdens on the federal government or those with whom it deals. The anti-discrimination rule of the intergovernmental

immunity doctrine is aimed at preventing one sovereign from unduly interfering with another sovereign's functions. The district court correctly recognized that AB 450's notice requirements do not penalize any employer for its choice to deal with the federal government.

Finally, beyond the lack of merit to the United States' legal claims, enjoining California's laws while this litigation continues would be inequitable and contrary to the public interest. Preventing enforcement of SB 54, AB 103, and AB 450's notice provisions would compromise public safety and undermine state health, welfare, and labor protections. The United States faces no comparable harm, because California law does not interfere with the federal government's ability to use its own resources to enforce federal immigration laws in any manner that it sees fit.

## STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy, never granted as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A party seeking such relief must establish that it is likely to succeed on the merits, that it will suffer irreparable harm, that the equities tip in its favor, and that an injunction serves the public interest. *Id.* This Court reviews a district court's denial of preliminary relief for abuse of discretion. *Am. Trucking Ass'ns, Inc. v. City of Los*

*Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  Questions of law are reviewed de novo.  *See id.*

## ARGUMENT

I. **CALIFORNIA'S DECISION TO LIMIT SOME FORMS OF ASSISTANCE TO IMMIGRATION ENFORCEMENT EFFORTS COMPLIES WITH FEDERAL LAW (SENATE BILL 54)**

The INA neither expressly nor impliedly preempts SB 54.  SB 54 is consistent with 8 U.S.C. § 1373, properly construed, because SB 54 expressly permits state and local law enforcement officials to share with the federal government information regarding the citizenship or immigration status of any individual.  If read as the United States proposes, the INA would violate the constitutional prohibition on federal commandeering of States.  In addition, SB 54 does not discriminate against the federal government or those with whom it deals in contravention of principles of intergovernmental immunity.

### A.   The INA Does Not Preempt SB 54

The United States contends that 8 U.S.C. § 1373 expressly preempts SB 54's restrictions on communicating release dates and address information.  Opening Br. 48-51.  It also contends that the INA impliedly preempts SB 54's information-sharing restrictions and its limitations on transferring individuals to immigration custody.  OB 38-46.  Neither contention is correct.

1. **The INA Does Not Expressly Preempt SB 54's Information-Sharing Provisions**

SB 54 incorporates section 1373 and therefore does not conflict with it. Section 1373 provides that a State may not restrict the communication of information "regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). SB 54 expressly allows sharing of such information. Cal. Gov't Code § 7284.6(e). The United States ignores this aspect of SB 54, but its language conclusively demonstrates that California law is consistent with section 1373. *See City & Cty. of San Francisco v. Sessions*, No. 17-cv-4642, 2018 WL 4859528, at *29 (N.D. Cal. Oct. 5, 2018) (SB 54 "complies with Section 1373").

The United States urges the Court to disregard the natural reading of section 1373, arguing that the statute goes beyond information about citizenship or immigration status to encompass the sharing of release dates and address information. OB 48-51. But the phrase "citizenship or immigration status, lawful or unlawful" means a person's legal classification under federal law. *See, e.g.*, 8 U.S.C. §§ 1151(b)(1)(E) ("permanent resident status"), 1159(b) (adjustment "to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum"), 1255 ("status of nonimmigrant"); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 333 (E.D. Pa. 2018), *appeal docketed*, No. 18-2648 (3d Cir.) (phrase "plainly means an individual's category of presence in the United

States—e.g., undocumented, refugee, lawful permanent resident, U.S. citizen,

etc.—and whether or not an individual is a U.S. citizen, and if not, of what

country"). Accordingly, information "regarding" citizenship or immigration status,

lawful or unlawful refers only to information about "what one's immigration status

is," ER 46, such as whether a person is an American citizen, holds a green card, or

lacks documentation authorizing presence in the United States, *see* 8 U.S.C.

§ 1357(g)(10)(A) (communications "regarding the immigration status of any

individual" include "reporting knowledge that a particular alien is not lawfully

present in the United States").

When Congress has intended to reach broad swaths of information, or

specifically a person's address, it has used different words. For example, in

creating a central index of non-citizens entering the country, Congress directed the

inclusion of "such other relevant information as the Attorney General shall require

as an aid to the proper enforcement of this chapter." 8 U.S.C. § 1360(a); *see also*

*id.* § 1367(a)(2) (forbidding disclosures of "any information which relates to an

alien"). Similarly, the INA requires federal agencies to communicate to ICE, upon

request, "[a]ny information in any records … as to the identity and location of

aliens," *id.* § 1360(b), and the Social Security Administrator must "provide the

Attorney General with information regarding the name and address" of

undocumented individuals reporting employment earnings, *id.* § 1360(c). Other

provisions of the INA specifically include address information. *E.g.*, *id.* § 1375a(c) (disclosure of "name or contact information"); *id.* § 1375a(e)(6) ("personal contact information" includes information "that would permit individuals to contact each other" and includes, *inter alia*, names, addresses, and phone numbers); *id.* § 1372(c) ("identity and current address"). Had Congress intended for section 1373 to reach addresses or other information, it would have said so.

The United States maintains that section 1373's use of the word "regarding" reflects an intent to encompass "whether a given alien may actually be removed or detained." OB 49. That is not a natural reading of the phrase "information regarding the citizenship or immigration status" of an individual. 8 U.S.C. § 1373(a). And while terms like "regarding" may "generally ha[ve] a broadening effect," *Lamar, Archer & Cofrin, LLP v. Appling*, __ U.S. __, 138 S. Ct. 1752 (2018), they do not "extend to the furthest stretch of [their] indeterminancy," *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995). Here, the United States' understanding of the word "regarding" "would know no bounds," ER 46, particularly in light of the extraordinarily broad range of facts that may have some connection to federal removability or detention decisions, *see, e.g.*, 8 U.S.C. § 1182 (vaccination history, communicable disease

27

diagnoses, physical or mental health disorders, membership in totalitarian party, education, skills, and financial resources all relevant to admissibility).[2]

Finally, the United States claims that two legislative history reports demonstrate Congress's intent to reach information beyond that concerning citizenship and immigration status. OB 49-50. "Congress's authoritative statement is the statutory text, not the legislative history." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 599 (2011) (internal quotation marks omitted). That is especially true here, where the broad language cited (referring to "presence, whereabouts, or activities" and "any communication" between federal and state officials) comes from a report accompanying another statute (8 U.S.C. § 1644) and is not tethered to the statutory text. *See* H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.).

---

[2] The United States' reliance on prior California Attorney General publications (OB 51) does not advance its reading of section 1373. The cited Information Bulletin notes that federal law restricts state and local prohibitions on "providing information," but does not specify the scope of such "information." ER 90. The bulletin refers to "release dates," but only to describe then-applicable state law. *Id.* District courts, moreover, have since construed section 1373 as not encompassing such information. *San Francisco*, 2018 WL 4859528, at *28 (citing cases). The cited 1992 Attorney General Opinion precedes the enactment of section 1373 as well as *Printz v. United States*, 521 U.S. 898 (1997). *See* 75 Op. Cal. Att'y Gen. 270 (1992). It thus does not reflect the effect of those central legal developments. *See infra* at 35-36 (discussing *Printz*).

### 2. The INA Does Not Impliedly Preempt SB 54's Provisions Addressing Information Sharing or Transfers of Individuals to Immigration Custody

Beyond claiming that SB 54 conflicts with section 1373, the United States argues that California's law obstructs the enforcement of federal immigration law. OB 38-46. This claim largely ignores the substantial assistance to immigration officers that SB 54 authorizes, particularly when it comes to detaining individuals who pose a threat to public safety. Notably, communication of release dates and help with transfers are permitted with respect to individuals convicted of the vast majority of offenses triggering federal officials' duty to detain pending removal proceedings. *Compare* 8 U.S.C. § 1226(c) *with* Cal. Gov't Code § 7282.5(a).

In those areas where SB 54 does limit aid, the district court correctly recognized that California's decision to refrain from helping is not the same as interfering. As explained above, SB 54 establishes the conditions under which state and local officials may deploy their *own* financial and personnel resources to assist immigration officials. Nothing in this case thus "involves any affirmative *interference* with federal law enforcement at all, nor is there any interference whatsoever with federal immigration authorities." *City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018) (claim that declining to assist amounts to obstruction is "a red herring"). As the district court said, there is a difference between

"standing aside," as California has chosen to do in some circumstances, and "standing in the way."  ER 50.

The United States' obstacle-preemption claim fails at the outset for the additional reason that it misunderstands what it takes for a federal law to preempt a State's regulation of its own law enforcement resources.  The United States argues that the INA "allow[s]" States to vindicate their interests in enforcing state criminal law based on a congressional "assumption" that States will facilitate transfers to immigration authorities as soon as state custody concludes.  OB 40-41; *id.* at 19 (INA "presumes" States will provide such help).  But a federal statute cannot nullify state law based on a mere "assumption."  On the contrary, courts reviewing implied-preemption claims "assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress."  *Arizona*, 567 U.S. at 400 (internal quotation marks omitted).  The vague "assumption" advanced by the United States is not the kind of clear statement that could strip California of its sovereign authority to allocate its own law enforcement resources.

In any event, the INA does not reflect any congressional judgment that States must participate in immigration enforcement activities.  When Congress determined to make immigration consequences depend, in some circumstances, on a non-citizen's state criminal history, and to generally permit federal removal only

after completion of state criminal sentences, 8 U.S.C. §§ 1227(a)(2), 1231(a)(4), it imposed no obligations on States to maximize the efficiency of federal removal efforts when state custody ends. Significantly, with the exception of section 1373(a), all of the statutory provisions cited by the United States in support of its obstacle-preemption argument (OB 36-38) direct the activities of the federal government. *See* 8 U.S.C. § 1226(a) ("warrant issued by the Attorney General" authorizes arrest and detention); *id.* § 1226(c) ("Attorney General shall take into custody" certain individuals); *id.* § 1226(d)(1)(A) ("Attorney General shall devise and implement" information-sharing system); *id.* § 1226(d)(1)(B) ("Attorney General shall devise and implement" training program); *id.* § 1231(a)(4)(A) ("Attorney General may not remove"); *id.* § 1231(a)(1)(A) ("Attorney General shall remove"); *id.* § 1231(a)(2) ("Attorney General shall detain"); *id.* § 1373(c) (ICE "shall respond" to inquiries). Nothing in the text of these provisions suggests an intent to impose mandates on States, or to constrain their regulatory authority.

The United States incorrectly argues that section 1226(a) obligates state officials to facilitate the transfer of individuals in state custody. *See* OB 38-39. That statute authorizes federal immigration agents to arrest individuals "[o]n a warrant issued by the Attorney General … pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). These administrative arrest warrants are directed to "[a]ny immigration officer

authorized … to serve warrants of arrests for immigration violations," and empower that officer to seize a person.  U.S. Dep't of Homeland Security, Warrant for Arrest of Alien, Form I-200 (Rev. 09/16), *available at* https://www.ice.gov/sites/default/files/documents/Document/2017/I-200_SAMPLE.PDF (last visited Nov. 1, 2018); *see also* 8 C.F.R. § 287.5(e)(3) (listing immigration officers authorized "to execute warrants of arrest for administrative immigration violations").  They do not command a state official to assist with or facilitate the arrest.

This Court's decision in *Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Administration*, 860 F.3d 1228 (9th Cir. 2017), on which the United States relies (OB 38-39), illustrates the distinction.  There, a federal agency issued a subpoena to a state agency demanding that it produce records it had created.  *Oregon PDMP*, 860 F.3d at 1232.  An ICE administrative warrant, in contrast, does not compel any action on the part of a state or local official.

There is likewise nothing in the federal regulatory scheme requiring States to alert federal agents before releasing a state or local inmate.  The INA authorizes federal officers to issue detainers to state and local officials seeking advance notification of an individual's release, but detainers are only requests for voluntary cooperation.  *See* 8 U.S.C. § 1357(d); *Arizona*, 567 U.S. at 410.  ICE itself recognizes that its detainers carry no legal compulsion.  8 C.F.R. § 287.7(a)

("detainer is a request"); SER 200 (DHS Form I-247A) ("[i]t is … requested that you … [n]otify DHS as early as practicable … before the alien is released from your custody" (capitalization omitted)); *see also Galarza v. Szalczyk*, 745 F.3d 634, 640-642 (3d Cir. 2014) (detainers seeking temporary custody not mandatory).[3]

In addition, with the exception of section 1373's narrow information-sharing mandate with which SB 54 complies, the INA recognizes that any participation by States in immigration enforcement activities is up to each State to decide for itself. Among other things, Congress provided that willing state engagement in immigration efforts must be consistent with state law. *Supra* at 6 (discussing 8 U.S.C. §§ 1252c(a), 1357(g)). The INA does not "prevent states from regulating whether their localities cooperate in immigration enforcement." *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) (discussing field preemption) (emphasis omitted).

---

[3] *Amici* (but not the United States) suggest that SB 54 leads to unlawful concealing, harboring, or shielding in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). Nat'l Law Enforcement Ass'ns Br. 12-14; Municipalities Br. 10-13. That provision criminalizes actions to conceal, shield, or harbor taken with the intent to violate federal immigration laws. *United States v. You*, 382 F.3d 958, 965-966 (9th Cir. 2004). It does not encompass a decision by state and local officials to refrain from aiding enforcement in a manner contemplated by the INA in compliance with state law.

Finally, the United States' analogy to the preempted state statute in *Arizona v. United States* is unsound. *See* OB 2. There, Arizona sought to decide for itself when a person should be arrested for suspected violations of federal immigration law. 567 U.S. at 407-410. Here, "SB 54 does not add or subtract any rights or restrictions upon immigrants." ER 45. California simply allows federal officers to make enforcement decisions using their own resources, while allowing state cooperation under defined circumstances.[4]

To be sure, the United States would prefer that States and localities assist federal authorities in achieving federal enforcement objectives. But where Congress contemplated the possibility of voluntary state and local participation but did not mandate it, a State does not impair the operation of federal law by volunteering in some circumstances but not in others.

---

[4] *Amici* States' assertion that California takes a different position here than it did in *Arizona* is not well taken. *See* States Br. 2-3. There, like here, California explained that States "can choose to cooperate or not cooperate with federal enforcement efforts"; "States have broad authority to enact and enforce laws affecting all persons within their borders"; state laws regulating the use of state funds are not preempted; and removals are the responsibility of the federal government. Calif. Br., *Arizona v. United States*, No. 11-182 (U.S.), 2012 WL 1054493 at *2-*3, *4-*5, *8, *14, *16 (2012) (footnote omitted).

**B.    Reading the INA to Prohibit California from Declining to Participate in Immigration Enforcement Would Create Serious Constitutional Concerns**

The United States interprets the INA as compelling state and local officials to assist with federal immigration enforcement activities and prohibiting the California Legislature from constraining the discretion of state and local officials to provide such assistance.  Contrary to the United States' arguments (OB 43-46), that reading of federal law would result in unconstitutional commandeering of States and override the usual balance of federal-state power.  The Court should not construe the statute to contain such unconstitutional commands.

The Constitution "'confers upon Congress the power to regulate individuals, not States.'"  *Murphy v. Nat'l Collegiate Athletic Ass'n*, __ U.S.__, 138 S. Ct. 1461, 1476 (2018) (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)). Under the Tenth Amendment and the structure of the Constitution, the federal government "may not compel the States to implement, by legislation or executive action, federal regulatory programs."  *Printz v. United States*, 521 U.S. 898, 925 (1997).  In *Printz*, for example, the Supreme Court held that Congress could not require local sheriffs to perform background checks or related tasks concerning prospective gun purchases as part of a congressional scheme regulating the distribution of firearms.  *Id.* at 925-933.  Such a requirement to administer a federal regulatory effort, the Court concluded, was "fundamentally incompatible with our

constitutional system of dual sovereignty." *Id.* at 935; *see also New York*, 505 U.S. at 175-176 (unconstitutional to require State to take title to radioactive waste as part of federal regulatory approach to waste disposal).

Here, any congressional requirement that state and local officials furnish release dates and home and work addresses to immigration officials or facilitate transfers of individuals in federal custody (*see* OB 42, 44, 46) would likewise be inconsistent with the constitutional design. Imposing such requirements would conscript state officials into executing a federal program to detain and remove individuals based on federally determined enforcement priorities. It would stop California from "declin[ing] to administer [a] federal program." *New York*, 505 U.S. at 177. And it would compel States and localities to divert their attention from issues of greater local concern, *see id.* at 174, and "to absorb … financial burden[s]" of federal immigration enforcement, *Printz*, 521 U.S. at 930. Indeed, the United States' primary concern with SB 54 appears to be that, without the ability to harness California's aid, the federal government will have to commit more of its own resources to accomplish its enforcement goals. *See* OB 39-40; SER 81 (lines 17-19) (after SB 54, ICE required "to send more resources to the State of California to do the same job we used to do with less"); *id.* (lines 19-20) ("[w]e lost the efficiency of working inside the jail"). The Constitution, however,

does not permit the national government "to impress into its service—and at no cost to itself—the police officers of the 50 States." *Printz*, 521 U.S. at 922.

The Constitution also does not permit Congress to deprive the California Legislature of its authority to set the terms on which state and local authorities may participate in immigration enforcement activities. *See* OB 41, 46. Under the anti-commandeering doctrine, Congress may neither compel state legislatures to affirmatively adopt federally preferred policies, *New York*, 521 U.S. at 161-162, nor preclude them from enacting legislation of their own choosing, *Murphy*, 138 S. Ct. at 1477-1478. The United States' reading of the INA here would purport to order the California Legislature to refrain from adopting measures limiting state and local discretion to assist the federal government. That would amount to a federal "dictate[] [of] what a state legislature may and may not do." *Id*. at 1478. The United States disclaims the intention of requiring States "to regulate in a particular area by enacting or repealing a particular law," but it asserts that, under its interpretation of the INA, federal law would "[p]revent[] states from adopting a policy" with which the United States disagrees. OB 43 (issue presented "is whether state and local governments can put into effect broad policies"). That is the definition of legislative commandeering. *See Murphy*, 138 S. Ct. at 1478 (Congress may not directly order state legislatures to "refrain from enacting state law" governing the State's own activities).

Consistent with these principles, a number of district courts have correctly held that section 1373 reflects an unconstitutional effort to commandeer state legislative activities. Those courts have explained that section 1373, which proscribes certain state regulation of state and local sharing of immigration and citizenship status information, violates Tenth Amendment principles by "directly tell[ing] states and state actors that they must refrain from enacting certain state laws." *City of Philadelphia*, 309 F. Supp. 3d at 330; *see also City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 866-873 (N.D. Ill. 2018), *appeal docketed*, No. 18-2885 (7th Cir.) (similar); *San Francisco*, 2018 WL 4859528, at *15-*17 (similar); ER 42 ("constitutionality of Section 1373 highly suspect"). Here, a reading of the INA that would limit California's ability to regulate state and local communication of release dates and address information would have the same unconstitutional effect.[5]

---

[5] In *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), the Second Circuit rejected a claim that section 1373 facially violated the Tenth Amendment, reasoning that the statute does not "directly compel states or localities to require or prohibit anything." *Id.* at 35. *Murphy*, however, has since made clear that a federal proscription on state legislative action offends the Constitution in the same way that a federal compulsion to affirmatively enact a state law does. 138 S. Ct. at 1478 (distinction between the two "is empty"). The specific issue of section 1373's facial validity is not presented by this case, because SB 54 permits the sharing of the categories of information covered by that federal provision. *Supra* at 25.

The federalism concerns with the United States' interpretation of the INA are acute, because it would vest the federal government with authority to dictate how decision-making power is distributed within the State and to control how the State prioritizes the use of its own law enforcement resources. In the United States' view, the authority to determine whether and how state and local officials cooperate with immigration officers resides not with state policymakers, but apparently with individual state and local employees, even as they carry out their official duties using public resources. The federal government does not have the power to prescribe how a State allocates its internal decision-making power or fixes its own enforcement priorities in this way. *See, e.g.*, *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, __ U.S. ___, 135 S. Ct. 2652, 2673 (2015) ("States retain autonomy to establish their own governmental processes"); *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 607-608 (1991) ("well settled" that local governments are "'created as convenient agencies for exercising such of the government powers'" granted them by State in its "'absolute discretion'").

Furthermore, the United States is incorrect that the cited provisions of the INA regulate private actors and should therefore be viewed as valid preemption statutes. OB 44-45; *see Murphy*, 138 S. Ct. at 1479 (for federal statute to preempt state law, it "must be best read as one that regulates private actors"). The United States construes the INA to restrict States in the performance of their legislative

and law enforcement duties—including with respect to incarcerating private

individuals, an activity in which no non-governmental actor may engage. That the

ultimate object of federal immigration law is to regulate the conduct of private

individuals who seek to enter and remain in this country does not mean that the

United States' proposed restraints on States qualify as regulation of private parties.

The federal laws at issue in *Printz* and *Murphy* were aimed at addressing private

conduct (firearms possession and sports betting), but the challenged provisions

were nevertheless invalid because the means Congress chose—directing state and

local officials in how they conducted their regulatory and legislative activities—

exceeded the federal government's constitutional authority.

This is not a situation in which a federal statute, while phrased as a restriction

on States, in substance merely preempts state regulation of private actors. *See*

OB 45; *Murphy*, 138 S. Ct. at 1480. The United States' construction of the INA

does not address whether or how States may regulate private parties who wish to

assist with immigration enforcement efforts. That makes this case different from

*Hodel v. Virginia Surface Mining & Reclamation Association, Inc.*, 452 U.S. 264

(1981), cited by the United States (at 44-45). There, the federal law constrained

States' choices in regulating private mine operators. *Hodel*, 452 U.S. at 288-293.

Here, the federal government's claim is that the INA controls how States may

regulate state and local officials in the discharge of their public duties.  The two are

not the same.

Prior decisions discussing information-reporting mandates also do not support

the United States' position.  *See* OB 46.  Whether or not a basic reporting

requirement would comport with the Tenth Amendment, the United States here

envisions that state and local officials will be enlisted as integral parts of regular,

ongoing federal enforcement efforts, available to be called upon by immigration

officers to help them with their endeavors.  The United States would also preclude

States from setting the terms on which state and local employees, in their official

capacities and using public resources, may engage with immigration officers.  Such

federal control over state activities is not like the law upheld in *Reno v. Condon*,

528 U.S. 141 (2000).  There, the federal statute regulated an activity in which both

States and private actors engaged and did not require state officials to help enforce

federal law.  *Reno*, 528 U.S. at 151; *Murphy*, 138 S. Ct. at 1478-1479 (discussing

*Reno*).[6]

It is "well-established" that federal courts must "be certain of Congress's

intent before finding that federal law overrides the usual constitutional balance of

---

[6] *Oregon PDMP*, 860 F.3d 1228, on which the United States also relies (OB 46) is
not relevant.  That case did not involve any Tenth Amendment or commandeering
claim.

federal and state powers." *Bond v. United States*, 572 U.S. 844, 858 (2014)

(internal quotation marks omitted); *see also Gregory v. Ashcroft*, 501 U.S. 452,

460 (1991) (similar); *New York*, 505 U.S. at 169-170 (similar).  Here, the United

States' construction of the INA would override the usual balance of federal and

state powers by permitting Congress to commandeer state executive and legislative

functions.  Nothing in the INA's text or structure indicates an intent to issue such

commands.

### C. SB 54 Does Not Compromise the Federal Government's Immunity from State Regulation

Principles of intergovernmental immunity also provide no basis on which to

enjoin SB 54.  *See* OB 47-48.  Under the Supremacy Clause, a State may not

"regulate[] the United States directly or discriminate[] against the Federal

Government or those with whom it deals." *North Dakota v. United States*, 495

U.S. 423, 435 (1990) (plurality); *see also Boeing Co. v. Movassaghi*, 768 F.3d 832,

839 (9th Cir. 2014) (same).  The Supreme Court has taken "a functional approach

to claims of intergovernmental immunity, accommodating of the full range of each

sovereign's legislative authority and respectful of the primary role of Congress in

resolving conflicts between the National and State Governments." *North Dakota*,

495 U.S. at 435 (plurality).  The purpose behind the doctrine's anti-discrimination

rule is to prevent States from "directly obstruct[ing] the activities of the Federal

Government." *Id.* at 437-438; *see also Davis v. Mich. Dep't of Treasury*, 489 U.S.

803, 814 (1989) (immunity doctrine is "based on the need to protect each sovereign's governmental operations from undue interference by the other").

The anti-discrimination principle of the intergovernmental immunity doctrine does not constrain state laws like SB 54 that limit state participation in federal regulatory activities.  As just explained, the Constitution does not permit the federal government to commandeer States or localities into implementing a federal program.  If the federal government could re-cast a State's decision not to administer a federal regulatory program as unconstitutional discrimination against the United States, there would be nothing left of the anti-commandeering doctrine.

Even if the intergovernmental immunity doctrine applied to SB 54, the United States still cannot prevail.  Congressional action may "sufficiently qualif[y] the intergovernmental immunity of the United States to permit the state to make the distinction it has."  *United States v. Lewis Cty.*, 175 F.3d 671, 676 (9th Cir. 1999).  In enacting the INA, Congress contemplated that States would make their own voluntary choices about whether to participate in immigration enforcement.  *Supra* at 6, 33.  If a State exercising that choice declines to provide certain forms of assistance to immigration authorities, that does not impermissibly discriminate against the United States.  SB 54, moreover, does not single out federal officers.  It forbids certain assistance to any official—federal, state, or local—who is enforcing immigration law.  Cal. Gov't Code § 7284.4(c).

Finally, even if SB 54 burdened only federal immigration activities, the disparate treatment would be justified by significant differences between those activities and other kinds of law enforcement. Under the intergovernmental immunity doctrine, differences in treatment may be justified if there are "significant differences between the [] classes" of regulated activities. *Davis*, 489 U.S. at 815-816 (internal quotation marks omitted); *see also North Dakota*, 495 U.S. at 438 (plurality) (doctrine compares burden on federal contractors and that on "other similarly situated constituents of the State"). As explained above, participation in immigration enforcement jeopardizes the effectiveness of state and local efforts to enforce state criminal law. Participation in other kinds of law enforcement activity—such as state and federal criminal law enforcement—does not pose the same risk. The two categories of activities are different in kind, and California is entitled to treat them differently.

## II. FEDERAL LAW DOES NOT DEPRIVE THE CALIFORNIA ATTORNEY GENERAL OF AUTHORITY TO INSPECT IN-STATE DETENTION FACILITIES (ASSEMBLY BILL 103)

The United States is also not likely to succeed on its challenges to California's detention-inspection scheme based on theories of obstacle preemption (OB 27-29) and the intergovernmental immunity doctrine (OB 25-27).

## A. The INA Does Not Preempt AB 103

The INA does not divest the California Attorney General of his authority under Assembly Bill 103 to inspect detention facilities housing civil immigration detainees within the State. The INA permits the federal government to contract with state and local detention facilities to hold individuals subject to federal removal proceedings. 8 U.S.C. §§ 1103(a)(11), 1231(g). That basic contracting authorization contains no indication of Congress's intent—and certainly no "'clear and manifest'" one, *Arizona*, 567 U.S. at 400—to deprive States of their general authority to assure the health and welfare of individuals confined within their borders. Indeed, the United States concedes that States may apply general inspection requirements and other health and safety standards to facilities holding civil immigration detainees. OB 18-19. That concession is consistent with ICE's contractual arrangements with detention facilities, which expressly provide that facility operators are bound by state law. *E.g.*, SER 145 (detention services must comply with "all applicable federal, state, and local laws and standards," and in case of conflict, "the most stringent shall apply"); *id.* at 130-134, 138, 140-141, 145-152, 158-160, 163, 170-180, 184-188, 192-193 (similar).[7]

---

[7] Defendants' supplemental excerpts of record contain the unsealed, redacted versions of these documents, which were originally filed unredacted and under seal with California's opposition to the preliminary injunction motion. *See* Dist. Ct. Dkt. Nos. 53 (sealing order), 74 & 74-2 (California's opposition), 80 (order

The United States misunderstands the scope of California law when it claims that AB 103 impermissibly invades federal detention and removal determinations. OB 30-31, 34-36. AB 103 does not regulate whether or where an immigration detainee may be confined, purport to require federal detention decisions or removal proceedings to conform to state law, or require any ICE contractors to obtain a state license. The statute therefore is not analogous to a state effort to prevent the federal government from entering into agreements with its chosen contractors until the State is satisfied with the contractor's qualifications. *See* OB 35 (citing *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189-190 (1956) (per curiam), and *Gartrell Constr., Inc. v. Aubry*, 940 F.2d 437, 441 (9th Cir. 1991)). AB 103 also does not allow a state officer "to decide whether an alien should be detained for being removable" like the statute invalidated in *Arizona*, which empowered state officials to arrest individuals believed to be removable under federal law. 567 U.S. at 409; *see* OB 34.

The United States focuses on AB 103's authorization of a review of "the standard of care and due process provided" to immigration detainees and "the circumstances around their apprehension and transfer." Cal. Gov't Code § 12532(b)(1)(B), (C); *see* OB 30-31. The language concerning the "due process

_____

granting motion to seal), 212 (unsealing order), 213 (filing of unsealed, redacted documents).

provided" directs an examination of conditions of confinement that affect detainees' ability to access courts—such as the adequacy of the facility's law library, the availability of unmonitored communications with counsel, and the ability to send and receive mail. *Cf. Bounds v. Smith*, 430 U.S. 817, 828 (1977) (due process right encompasses conditions such as access to law libraries or legal assistance); *Cornett v. Donovan*, 51 F.3d 894, 897-898 (9th Cir. 1995) (discussing due process right of access to courts for civilly committed detainees). That standard does not provide for an inquiry into, or purport to apply state law to, the federal government's conduct of removal proceedings or disturb any detention or removal decision.

AB 103's provision for "review of the circumstances around [detainees'] apprehension and transfer to the facility" authorizes a review of how individuals were taken into custody and whether they were transferred from different facilities. *See* Cal. Gov't Code § 12532(b)(1)(C). Circumstances of individuals' apprehension and transfer may involve, among other things, whether state and local law enforcement officers participated in arrests under circumstances that would violate state law, whether detainees are being held in locations far from their California-resident families, or whether resources in local detention facilities are being used to house individuals arrested in other States—information that implicates the State's interests in its officials' compliance with state law, the well-

being of state residents, and the expenditure of public funds. Although the statute also contemplates discovery of the circumstances of arrests by federal officers, mere collection of such factual data does not (and cannot) disturb any federal arrest or detention decision. Contrary to the United States' suggestion, gathering such information from a detention facility or a detainee is not equivalent to a state court ordering the United States to discharge a soldier based on claimed violations of federal law. *See* OB 34 (citing *Tarble's Case*, 80 U.S. 397 (1871)). Nor does it resemble a county sheriff holding a U.S. marshal on murder charges for actions taken on duty to defend the life of a U.S. Supreme Court Justice. *See* OB 34 (citing *In re Neagle*, 135 U.S. 1, 62 (1890)).

To the extent the United States argues, as it did below, that AB 103 conflicts with 8 C.F.R. § 236.6 (OB 30, 35), that too is incorrect. That regulation provides that "[n]o person, including any state or local government entity or any privately operated detention facility," that houses civil immigration detainees, "and no other person who by virtue of any official or contractual relationship with such person obtains information relating to any detainee, shall disclose or otherwise permit to be made public" certain personal information about detainees. 8 C.F.R. § 236.6. As the district court concluded (ER 24-26), the regulation restricts disclosures of detainee information to the public, not to a state official like the California Attorney General who, as the State's chief law officer, obtains investigative

48

information subject to ongoing confidentiality protections. *See* Cal. Gov't Code § 11183; 68 Fed. Reg. 4364, 4364 (Jan. 29, 2003) ("rule governs the public disclosure" of information regarding detainees and "establishes a uniform policy on the public release" of such information). The regulation, moreover, specifically contemplates disclosure of detainee information to third parties with an "official or contractual relationship" with a detention facility, subject to a bar on re-disclosure to the public. 8 C.F.R. § 236.6.

Finally, if the United States believes that any AB 103 inspections are conducted in such a way to compromise federal discretion over immigration enforcement matters, it may challenge those inspections in a concrete setting on developed facts. Below, the United States asserted generally that AB 103 inspections cause facilities to divert resources from their other functions, but it did not present evidence of interference into federal detention, removal, or transfer decisions. *See* SER 4-5 (Reporter's Tr. 53:8-54:11), 99-103, 232-233 (¶ 60). On the record before this Court, there is thus no basis on which to conclude that AB 103, on its face, represents an unconstitutional obstacle to the federal government's authority over immigration. *Cf. Arizona*, 567 U.S. at 416 (improper to enjoin state statute "without some showing that enforcement of the provision in fact conflicts with federal immigration law and its objectives").

## B.    AB 103 Does Not Discriminate Against the Federal Government

The district court was also correct in concluding that AB 103 does not single out the federal government for unfavorable treatment. ER 26.  As noted above, under principles of intergovernmental immunity, a State may not "regulate[] the United States directly or discriminate[] against the Federal Government or those with whom it deals." *North Dakota*, 495 U.S. at 435 (plurality).  The doctrine is aimed at protecting each sovereign's governmental functions from undue burdens. *See id.*  When a State imposes equivalent burdens on those with whom it deals, there is little concern about inappropriate interference with federal activities. *See United States v. Nye Cty.*, 178 F.3d 1080, 1086-1088 (9th Cir. 1999).

The United States emphasizes that AB 103 applies exclusively to detention facilities housing civil immigration detainees. OB 30, 31.  But "in analyzing the constitutionality of a state law, it is not appropriate to look to the most narrow provision addressing the Government or those with whom it deals." *North Dakota*, 495 U.S. at 438 (plurality).  The question is whether, in the aggregate, California is unjustifiably imposing heavier regulatory burdens on the federal government's partners than it lays upon its own. *See Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 385 (1960).  A state law "that appears to treat the Government differently on the most specific level of analysis may, in its broader regulatory context, not be discriminatory." *North Dakota*, 495 U.S. at 438 (plurality);

*Washington v. United States*, 460 U.S. 536, 542 (1983) (inquiry looks at regulatory structure as a whole).

The United States failed to establish discriminatory treatment here. California regulates conditions in facilities that house individuals detained under the authority of state law. *See, e.g.*, Cal. Penal Code §§ 4013, 4015, 4017, 4018.1, 4019.5, 4021, 4023, 4030, 4032. AB 103 itself imposes no similar confinement standards on facilities dedicated to immigration detention.

AB 103 does require inspections of facilities housing immigration detainees, but local facilities housing state criminal populations are also subject to state review. California law requires the Board of State and Community Corrections to inspect facilities holding individuals for state criminal offenses at least biennially. Cal. Penal Code §§ 6031, 6031.1(a). The Board inspects for compliance not only with general health and safety requirements but also with standards aimed at ensuring inmates' access to courts—such as the availability of legal reference materials and confidential communications with counsel. *Id.* § 6031.1(a); Cal. Code Regs. tit. 15, §§ 1063, 1064, 1068. Board officials are permitted to review inmate files and interview inmates as part of the inspection process. *Cf.* Cal. Penal Code § 6031.1; Cal. Code Regs. tit. 15, § 1041. And Board reports must be made available to the public. Cal. Penal Code § 6031.1(c). The United States asserts that AB 103 imposes greater burdens (OB 32), but it failed to marshal evidence

that, overall, the State's regulatory structure for detention facilities makes the United States worse off than the State or its political subdivisions.

The United States erroneously claims that AB 103 unconstitutionally discriminates against federal functions by adding burdens on top of the existing Board inspection scheme. *See* OB 32-33. Any facility that houses exclusively federal immigration detainees—including four private facilities operating in California (*see* SER 71 (¶ 4))—is not subject to Board inspection. *See* Cal. Penal Code § 6031.4 (definition of "local detention facility").[8] Facilities in the State that house both criminal and immigration populations are subject to inspection by both the Board and the Attorney General. *See id.* Significantly, each of these facilities is operated by a county government. *See* SER 71 (¶ 3), 229 (¶ 51), 230 (¶ 53). Thus, any added "burden" from the further AB 103 review falls most directly on the State's own political subdivisions. That fact belies any claim of discrimination against the United States.

Beyond that, any additional burden on facilities housing a civil immigration population would be justified by differences between immigration and criminal detention. As noted, under the intergovernmental immunity doctrine, disparate

---

[8] *See also* Board of State and Community Corrections, List of Statewide Local Detention Facilities, *available at* http://www.bscc.ca.gov/downloads/ AJFS_all%20facilities%20for%20web_12.21.17.pdf (list of local detention facilities inspected by Board) (last visited Nov. 5, 2018).

treatment between "those who deal with one sovereign" and "those who deal with the other" may be justified if there are "significant differences between the two classes." *Davis*, 489 U.S. at 815-816 (alterations and internal quotation marks omitted).  Civil immigration detainees (like pre-trial criminal inmates) may not be subject to conditions amounting to punishment.  *See Doe v. Kelly*, 878 F.3d 710, 720 (9th Cir. 2017).  Moreover, this Court has recognized that at least some civil detainees are entitled to less restrictive conditions than the criminally accused.  *See Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004).  The United States itself recognizes "the unique nature of civil immigration detention."  SER 231 (¶ 55).  Thus, any further review of facilities housing both immigration detainees and individuals in state criminal custody (both pre-trial and post-conviction) is justified by the differences in the detainee populations.  For that reason too, the United States cannot prevail on its challenge to AB 103.

## III. California's Employee Notice Requirements Are Consistent with Federal Law (Assembly Bill 450)

The United States is also not likely to prevail on its claims that AB 450's notice provisions are impliedly preempted (OB 27-29) and illegally discriminate against the United States (OB 25-27).

### A. Federal Law Does Not Preempt AB 450's Notice Provisions

As explained above, the INA as amended by IRCA forbids employers from hiring unauthorized workers.  8 U.S.C. § 1324a(a).  It also requires employers to

review documents establishing each employee's eligibility to work, to affirm on a Form I-9 that the required documents have been reviewed, and to retain those completed forms for prescribed periods. *Id.* § 1324a(b); 8 C.F.R. § 274a.2; *see generally Whiting*, 563 U.S. at 589. Federal immigration authorities are entitled to inspect an employer's I-9 records, but they must give employers at least three business days' notice before an inspection. 8 C.F.R. § 274a.2(b)(2)(ii). Federal regulations do not prohibit employers from sharing the notice with workers. *See id.*; SER 6 (RT 63:14-19) (United States' statement that federal law does not expressly prohibit employers from notifying employees of upcoming workplace audits).

AB 450's requirement that employers inform employees of I-9 inspections and their results do not interfere with Congress's scheme for regulating unlawful employment. California's notice provisions do not purport to permit employers to hire individuals without federally defined authorization, alter the manner in which employers must verify workers' employment eligibility, or impose sanctions inconsistent with federal law. AB 450 regulates the employer-employee relationship by in part correcting an information asymmetry between employers and workers. Without the required notifications, employers could use their information advantage to employees' detriment, such as by terminating them unnecessarily or denying them an opportunity to correct errors or deficiencies in

work-authorization documents.  *See supra* at 14-16.  Federal controls on unlawful employment were not intended to displace state regulation of this kind.  *See, e.g.*, *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 242 (2d Cir. 2006) (state worker safety protections not preempted).

AB 450's notice provisions also do not regulate or impede the federal inspection process.  *See* OB 24, 27.  California's notice requirements say nothing about how federal agents perform their duties or whether employers may comply with the I-9 inspection process.  Significantly, the notices required under AB 450 are consistent with the federal government's own advice to employers about I-9 inspections.  For example, the U.S. Department of Justice specifically recommends that employers inform workers of ICE audits.  *See* Office of Special Counsel for Immigration-Related Unfair Employment Practices, U.S. Department of Justice, Civil Rights Division, Employer Best Practices During Worksite Enforcement Audits (employers should "[d]evelop a transparent process for interacting with employees during [a worksite enforcement] audit, including communicating with employees that the employer is subject to an ICE audit").[9]  Similarly, ICE directs employers, after an inspection, to provide employees with copies of any notice of discrepancy and to give employees an opportunity to present ICE with additional

---

[9] Available at
https://www.justice.gov/sites/default/files/crt/legacy/2011/07/20/worksite_enforce
ment.pdf (last visited Nov. 1, 2018).

documentation of work eligibility.  U.S. Immigration and Customs Enforcement,

Fact Sheet: Form I-9 Inspection Overview (Jan. 8, 2018); *see also id.* (upon issuing

post-inspection notice of suspect documents, ICE provides employer and employee

opportunity to present documentation to demonstrate work authorization).[10]  There

is thus no "'conflict in technique,'" OB 27, between the state and federal

approaches.[11]

---

[10] Available at https://www.ice.gov/factsheets/i9-inspection (last visited Oct. 30, 2018).

[11] *Buckman Company v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), and *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), are off point.  *See* OB 27.  *Buckman* held that state-law claims for fraudulent misrepresentations by medical device makers to the Food and Drug Administration were preempted because they sought to police communications between regulated parties and a federal agency and distorted the federal device-approval process.  531 U.S. at 350-351.  *Crosby* held that a state statute that generally prohibited state contracts with companies doing business with Burma undermined Congress's decision to give the President broad discretion over economic sanctions and to exempt certain activities from those sanctions.  530 U.S. at 366-367, 374-380.  Both cases "involve[d] uniquely federal areas of regulation," and both addressed "state actions that directly interfered with the operation of [a] federal program."  *Whiting*, 563 U.S. at 604 (plurality) (discussing *Buckman* and *Crosby*).  In contrast, regulating California businesses through employee-notice provisions is not "such an area of dominant federal concern," and there "is no similar interference with [a] federal program."  *See id.* at 604, 605.  The United States' reliance on *Nash v. Florida Industrial Commission*, 389 U.S. 235 (1967), is misplaced for a similar reason.  *See* OB 28.  There, the State withdrew state benefits from workers who filed unfair practice charges with the National Labor Relations Board, contrary to Congress's clear intent.  *Nash*, 389 U.S. at 236-238.  AB 450's notice provisions do not similarly burden a federal agency's ability to do its job.

AB 450's notice provisions, moreover, are consistent with the INA's overall focus on addressing issues of unauthorized employment by action against employers. As the United States notes, federal law does, under certain circumstances, impose penalties on individuals who work without proper authorization. *See* OB 23, 28. But the INA reserves for employers its most significant sanctions. *Arizona*, 567 U.S. at 405 ("Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment."); H.R. Rep. No. 99-682, at 46 (1986) ("principal means of … curtailing future illegal immigration[] is through employer sanctions"). It is thus difficult to see why federal immigration enforcement efforts demand that employees "be kept in the dark," ER 35, while tolerating (indeed, requiring) that employers receive advance notice of federal scrutiny. The United States points to nothing in the INA supporting that result.

Furthermore, California law accounts for any special situations in which federal efforts would be jeopardized by notice to employees. AB 450 mandates notice "[e]xcept as otherwise required by federal law," and it "does not require a penalty to be imposed" when the employer withholds notice "at the express and specific direction or request of the federal government." Cal. Lab. Code § 90.2(a)(1), (b)(1), (c). The Labor Commissioner, the state official with principal

authority for enforcing AB 450's notice requirements, has interpreted the statute to mean that penalties will not apply in such situations.  SER 18.

Finally, if there were any doubt whether federal law displaces California's statute, that doubt must be resolved against preemption.  *See Arizona*, 567 U.S. at 400 (implied preemption requires congressional purpose to be "'clear and manifest'").  Federal law certainly reflects no unambiguous purpose to deprive States like California of the ability to adopt notice provisions like AB 450.

## B.  AB 450's Notice Provisions Do Not Conflict with Principles of Intergovernmental Immunity

AB 450 does not violate the intergovernmental immunity doctrine by discriminating against the federal government or those with whom it deals.  The purpose of the nondiscrimination rule is to prevent undue interference with federal activities.  *Supra* at 42-43.  Accordingly, the doctrine prevents a State from imposing more onerous clean-up standards on a federal contractor remediating a federal hazardous waste site than it applies to non-federal projects.  *Boeing*, 768 F.3d at 842-843.  It precludes cities from banning only the U.S. military and its agents from recruiting minors.  *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010).  And it forecloses States from taxing the lessees of federal property while exempting from the tax lessees of state property.  *Phillips*, 361 U.S. at 381-382, 387.

The doctrine does not concern laws like AB 450, which do not address, directly or indirectly, the operation of a federal program or contract. Unlike the laws invalidated in *Boeing*, *Arcata*, *Phillips*, and other intergovernmental immunity cases, California's notice requirements do not regulate or tax a government-employer relationship. They require California employers to provide information to California employees. The mere fact that those notices contain information about federal inspections does not convert them into a burden on those inspections.

The district court, moreover, correctly recognized that AB 450's notice provisions address only the employer-employee relationship. California's notice requirements "do not turn on the employer's choice to 'deal with' … federal law enforcement. An employer is not punished for its choice to work with the Federal Government, but for its failure to communicate with its employees." ER 35. In addition, as explained above, AB 450's notice requirements are consistent with the federal government's own approach to employer-employee communications concerning immigration inspections. And the United States has made no showing that application of state notice provisions obstructs federal inspection functions. In these circumstances, applying the intergovernmental immunity doctrine to invalidate California's notice requirements would, as the district court concluded, "stretch the doctrine beyond its borders." *Id.*

## IV.  A PRELIMINARY INJUNCTION IS NOT IN THE PUBLIC INTEREST

After rejecting the United States' claims on the merits, the district court did not consider the other prerequisites for granting a preliminary injunction: irreparable harm, the balance of equities, and the public interest.  *Winter*, 555 U.S. at 20; *see* ER 64-65.  The United States' inability to satisfy these elements is an alternative basis for affirmance.  *See Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 868 F.2d 1085, 1088 (9th Cir. 1989) (Court may affirm on any ground supported by record).

The balance of equities and public interest weigh strongly against enjoining California's laws during the pendency of litigation.  This Court has recognized that preventing a violation of the Supremacy Clause serves the public interest.  *See United States v. Arizona*, 641 F.3d 339, 345 (9th Cir. 2011), *aff'd in part, rev'd in part and remanded*, 567 U.S. 387 (2012); *Am. Trucking Ass'ns*, 559 F.3d at 1059-1060.  But a preliminary injunction here would lead to significant, concrete harm to the public.  A requirement that state and local officials assist with immigration enforcement efforts in the way the United States demands would deter crime victims and witnesses from coming forward, erode trust in local law enforcement, and compromise public safety.  *See* SER 20-34, 45-46, 49-58.  The United States claims that SB 54 makes its own enforcement efforts less efficient, but that argument ignores that SB 54 permits substantial cooperation with immigration

authorities, particularly with respect to individuals most likely to pose dangers to the public.

The United States likewise failed to present evidence that AB 103 inspections conducted by the Attorney General harmed facilities' detention operations. *See* SER 98-102, 232-235. In addition, the United States completed numerous I-9 inspections in California after AB 450 took effect without any harm stemming from the challenged notice procedure. *See* SER 82-90. Conversely, enjoining AB 103 would impair the State's ability to understand the conditions in which thousands of individuals are confined and the effect of that confinement on state resources and other state residents. And an injunction against AB 450's notice provisions would undermine employees' ability to protect themselves against inappropriate or even illegal actions by their employers. *Supra* at 14-16.

The California Legislature adopted SB 54, AB 103, and AB 450 to promote public safety and safeguard the health, welfare, and labor rights of state residents. The laws further the State's core sovereign interests and do not interfere with the United States' ability to use its own resources to enforce federal immigration law in the manner it sees fit. It would be inequitable and contrary to the public interest to block enforcement of the laws during the pendency of this litigation.

# CONCLUSION

The district court's denial of a preliminary injunction should be affirmed.

Dated: November 5, 2018

Respectfully submitted,

XAVIER BECERRA
  *Attorney General of California*
EDWARD C. DUMONT
  *Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*


*/s Aimee Feinberg*
AIMEE FEINBERG
  *Deputy Solicitor General*
SATOSHI YANAI
ANTHONY HAKL
CHRISTINE CHUANG
  *Supervising Deputy Attorneys General*
CHEROKEE DM MELTON
MAUREEN C. ONYEAGBAKO
LEE I. SHERMAN
  *Deputy Attorneys General*
KRISTIN LISKA
  *Associate Deputy Solicitor General*
CALIFORNIA DEPARTMENT OF JUSTICE
1300 I Street, Suite 125
Sacramento, CA 94244-2550
(916) 210-6003
Aimee.Feinberg@doj.ca.gov
*Attorneys for Defendants-Appellees*

## STATEMENT OF RELATED CASES

The pending appeal in *Steinle v. City and County of San Francisco*, No. 17-

16283 (9th Cir.) is related with respect to the issue of the scope of 8 U.S.C. § 1373.

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limits permitted by Ninth Circuit Rule 32-1(a). The brief is 13,804 words, excluding the portions exempted by Fed. R. App. P. 32(f), as counted by the word-processing program used to create the document. The brief's type size and type face comply with Fed. R. App. 32(a)(5) and (6).

Dated: November 5, 2018                    _/s Aimee Feinberg_
                                           Aimee Feinberg

**CERTIFICATE OF SERVICE**

I certify that on November 5, 2018 I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by use of the appellate CM/ECF system. I certify that all other participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: November 5, 2018        *\/s Aimee Feinberg*
                                                Aimee Feinberg