IN THE

# United States Court of Appeals

## FOR THE NINTH CIRCUIT

◆◆

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

—v.—

STATE OF CALIFORNIA; EDMUND G. BROWN, JR., Governor of California; XAVIER BECERRA, Attorney General of California,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO

**BRIEF OF *AMICI CURIAE* ADMINISTRATIVE LAW, CONSTITUTIONAL LAW, CRIMINAL LAW AND IMMIGRATION LAW SCHOLARS IN SUPPORT OF DEFENDANTS-APPELLEES**

HARRY SANDICK
MICHAEL D. SCHWARTZ
PATTERSON BELKNAP WEBB
   & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
hsandick@pbwt.com
mschwartz@pbwt.com

KEVIN A. CALIA
LAW OFFICE OF KEVIN A. CALIA
1478 Stone Point Drive, Suite 100
Roseville, California 95661
(916) 547-4175
kevin@calialaw.com

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ..................................................................1

SUMMARY OF ARGUMENT .....................................................................1

ARGUMENT ..............................................................................................4

I.     THE ADMINISTRATION'S EFFORTS TO FORCE THE ENTANGLEMENT OF LOCAL CRIMINAL JUSTICE SYSTEMS WITH IMMIGRATION ENFORCEMENT ARE HISTORICALLY ANOMALOUS AND CONSTITUTIONALLY SUSPECT..........................4

II.    THE STATE'S DECISION TO DISENTANGLE ITS LOCAL CRIMINAL JUSTICE SYSTEM FROM FEDERAL IMMIGRATION ENFORCEMENT IS NOT PREEMPTED BY FEDERAL LAW. ......................................................................13

     A.    Federal Law Should Not Be Construed To Preempt State Law Where Doing So Would Supersede the Historic Police Powers of the States and Raise Serious Constitutional Questions. .................14

     B.    Neither 8 U.S.C. § 1373 Nor the INA Should be Construed to Preempt SB 54. ........................................................16

CONCLUSION .........................................................................................26

APPENDIX ........................................................................................... A-1

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Arizona v. United States*,
  567 U.S. 387 (2012)......................................................................................*passim*

*Bond v. United States*,
  572 U.S. 844 (2014)................................................................................................14

*City and Cty. of San Francisco v. Sessions*,
  No. 17-cv-04642 (WHO), 2018 WL 4859528 (N.D. Cal. Oct 5,
  2018) ......................................................................................................................23

*City of Chicago v. Sessions*,
  321 F. Supp. 3d 855 (N.D. Ill. 2018)....................................................................21

*City of Chicago v. Sessions*,
  888 F.3d 272 (7th Cir. 2018) ...........................................................................11, 22

*City of New York v. United States*,
  179 F.3d 29 (2d Cir. 1999) ...................................................................................21

*City of Philadelphia v. Sessions*,
  280 F. Supp. 3d 579 (E.D. Pa. 2017).....................................................................11

*City of Philadelphia v. Sessions*,
  309 F. Supp. 3d 289 (E.D. Pa. 2018).....................................................................22

*Cnty. of Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017), *reconsideration denied*, 267
  F. Supp. 3d 1201 (N.D. Cal. 2017), *appeal dismissed as moot sub
  nom.*, *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225 (9th
  Cir. 2018) ...............................................................................................................11

*Demore v. Kim*,
  538 U.S. 510 (2003)...............................................................................................23

*Galarza v. Szalczyk*,
  745 F.3d 634 (3d Cir. 2014) .............................................................................10, 24

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)..........................................................................14

*Kelley v. Johnson*,
425 U.S. 238 (1976)..........................................................................1, 5

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996)..........................................................................15, 16

*Morales v. Chadbourne*,
996 F. Supp. 2d 19 (D.R.I. 2014), *aff'd*, 793 F.3d 208 (1st Cir. 2015) ................................................................................................10

*Moreno v. Napolitano*,
213 F. Supp. 3d 999 (N.D. Ill. 2016)................................................10

*Murphy v. NCAA*,
138 S. Ct. 1461 (2018)................................................................*passim*

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012)..........................................................................15

*New York v. United States*,
505 U.S. 144 (1992)..........................................................15, 20, 24

*North Dakota v. United States*,
495 U.S. 423 (1990)..........................................................................14

*Printz v. United States*,
521 U.S. 898 (1997)..........................................................15, 21, 24

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947)..........................................................................13, 16

*Steinle v. City & Cnty. of San Francisco*,
230 F. Supp. 3d 994 (N.D. Cal. 2017)..............................................18

*United States v. California*,
314 F. Supp. 3d 1077 (E.D. Cal. 2018) ............................................2, 8, 20

*United States v. Morrison*,
529 U.S. 598 (2000)..........................................................................15, 19

*Vargas v. Swan*,
854 F.2d 1028 (7th Cir. 1988) ...................................................................10

**Statutes**

U.S. Const. amend. IV ................................................................................10

U.S. Const. amend X.............................................................................*passim*

8 U.S.C. § 1103(a)(10)..................................................................................7

8 U.S.C. § 1103(a)(11)(A) ............................................................................7

8 U.S.C. § 1226...........................................................................2, 16, 23, 24

8 U.S.C. § 1231...........................................................................2, 16, 23, 24

8 U.S.C. § 1252c(a)........................................................................................7

8 U.S.C. § 1324(c) .........................................................................................9

8 U.S.C. § 1357(d) .........................................................................................6

8 U.S.C. § 1357(g)(1).....................................................................................7

8 U.S.C. § 1373 ....................................................................................*passim*

8 U.S.C. § 1373(a) ...................................................................................3, 17

Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1751, 100 Stat.
3207 (Oct. 27, 1986) ................................................................................6

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, §§ 7342-43, 102
Stat. 4469-70 (Nov. 18, 1988) .................................................................6

Cal. Gov't Code § 7284.2 ............................................................................19

Cal. Gov't Code § 7284.6(a)..........................................................3, 16, 18, 21

Cal. Gov't Code § 7284.6(e)................................................................3, 18, 21

Professional and Amateur Sports Protection Act, 28 U.S.C. § 3702 ..........19, 20, 22

## Other Authorities

Amada Armenta, *Protect, Serve, and Deport: The Rise of Policing as Immigration Enforcement* (2017) ....................................................................7

Anil Kalhan, *Immigration Policing and Federalism Through the Lens of Technology, Surveillance, and Privacy,* 74 Ohio St. L.J. 1105 (2013) .....................................................................................................5, 21

César Cuauhtémoc García Hernández, *Creating Crimmigration*, 2013 BYU L. Rev. 1457 (2013) ........................................................................6

Christopher N. Lasch et al., *Understanding "Sanctuary Cities"*, 59 B.C. L. Rev. 1703 (2018)...........................................................................6

Donald Trump Immigration Speech in Arizona (Aug. 31, 2016), *available at* http://www.politico.com/story/2016/08/donald-trump-immigration-address-transcript-227614 .............................................11

Gillian E. Metzger, *Federalism and Federal Agency Reform*, 111 Colum. L. Rev. 1 (2011) ....................................................................14, 15

Jennifer M. Chacón, *Unsecured Borders: Immigration Restrictions, Crime Control and National Security*, 39 Conn. L. Rev. 1827 (2007) .................................................................................................6

Juliet P. Stumpf, *States of Confusion: The Rise of State and Local Power over Immigration*, 86 N.C. L. Rev. 1557 (2008) .....................................5

Legal Counsel, *Assistance by State and Local Police in Apprehending Illegal Aliens* (Feb. 5, 1996), *available at* https://www.justice.gov/file/20111/download......................................9

Memorandum for the Att'y Gen., from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Non-preemption of the authority of state and local law enforcement officials to arrest aliens for immigration violations* (April 3, 2002) ................................9

Michael J. Wishnie, *State and Local Police Enforcement of Immigration Laws*, 6 U. Pa. J. Const. L. 1084 (2004)..........................................8

Robert A. Mikos, *Can the States Keep Secrets from the Federal Government?*, 161 U. Pa. L. Rev. 103 (2012) ......................................................21

S. Karthick Ramakrishnan & Pratheepan Gulasekaram, *The Importance of the Political in Immigration Federalism*, 44 Ariz. St. L.J. 1431 (2012) ......................................................................................8

Tom Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Nat'l Immigration Law Ctr. (Jan. 26, 2017), *available at* https://perma.cc/B57Q-XGTE ................................................................19

Yolanda Vázquez, *Constructing Crimmigration: Latino Subordination in a "Post-Racial" World*, 76 Ohio St. L.J. 599 (2015)......................................7

## INTEREST OF *AMICI CURIAE*

The United States' challenge to the State of California's decision to disentangle its local criminal justice system from federal immigration enforcement presents a question of statutory construction that is easily answered: Federal law does not preempt California Senate Bill 54 ("SB 54") on its face. *Amici*, who are listed in Appendix A, are 59 scholars of administrative law, constitutional law, criminal law, and immigration law. They have an interest in the proper resolution of conflicts between federal immigration law and state law based upon application of basic principles of statutory construction and constitutional law. *Amici* submit this brief to address these fundamental principles and to explain their constitutional and historical foundations. A similar brief filed by these *amici* was accepted in the District Court in this case. *See United States v. California*, No. 18-cv-00490, ECF No. 111 (E.D. Cal. May 18, 2018).[1]

## SUMMARY OF ARGUMENT

Since the Founding, "[t]he promotion of safety of persons and property [has been] unquestionably at the core of [the state's] police power." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976). In enacting SB 54, the State of California chose to

---

[1] The parties have consented to the filing of this *amici curiae* brief. No counsel for a party authored this brief in whole or in part and no person or entity, other than *amici curiae* and their counsel, has contributed money that was intended to fund preparing or submitting the brief.

exercise this core police power by disentangling its law enforcement resources from federal immigration enforcement. As the District Court correctly concluded, California's decision is a "permissible exercise[] of [its] sovereign power" that does not threaten federal supremacy in matters of immigration policy. *See United States v. California*, 314 F. Supp. 3d 1077, 1086 (E.D. Cal. 2018).

The Administration's efforts to entangle local criminal justice systems with immigration enforcement are historically anomalous and exceed its statutory and constitutional authority. For most of the Nation's history, state and local law enforcement played little to no role in the enforcement of federal immigration laws. In the modern era, Congress has authorized state and local officials to participate in enforcing immigration law in limited ways. But Congress has never *required* state and local governments to do so. Instead, where Congress has created a role for state and local jurisdictions to participate, Congress has consistently taken care to offer them a *choice*. In enacting SB 54, California has simply chosen to exercise that choice in the negative.

Nothing in federal statutory law preempts California's choice. The United States argues that the detention and removal provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1226 & 1231, preempt California's decision in SB 54 to refrain from offering some types of assistance to federal immigration

enforcement. *See* Brief for Appellant United States of America ("U.S. Br.") at 38-40 (discussing Cal. Gov't Code §§ 7284.6(a)(1)(C) & (D), (a)(4)). The United States also argues that parts of SB 54 directly conflict with 8 U.S.C. § 1373(a), even though SB 54 contains a savings clause that expressly exempts the sharing of information pursuant to Section 1373. *See id.* at 48 (discussing Cal. Gov't Code §§ 7284.6(a)(1)(C) & (D)); *see also* Cal. Gov't Code § 7284.6(e) (savings clause). SB 54 need not, and indeed should not, be construed to stand as an obstacle to implementation of the INA or to conflict directly with 8 U.S.C. § 1373. The detention and removal provisions of the INA impose obligations on *federal* officials; they were not intended to disturb state and local authority over the allocation of state and local law enforcement resources. And Section 1373 and SB 54 would conflict on their face only if they are read without regard to SB 54's savings clause, the plain meaning of Section 1373's terms, and the serious constitutional questions that the United States' construction of Section 1373 would create, including those arising from the Supreme Court's recent decision in *Murphy v. NCAA*, 138 S. Ct. 1461 (2018), which reaffirmed the ban on federal commandeering of state legislatures and officials.

The Court should not construe SB 54 and federal law to conflict. Rather, "[s]o far as [SB 54] fairly may be construed in such a way as to avoid doubtful

constitutional questions [it] should so be construed." *Arizona v. United States*, 567

U.S. 387, 400, 415 (2012). Where, as here, "[t]here is a basic uncertainty about

what the law means and how it will be enforced," the Supreme Court has instructed

that a court "should assume that 'the historic police powers of the States' are not

superseded." *Id.*

## ARGUMENT

**I.     THE ADMINISTRATION'S EFFORTS TO FORCE THE ENTANGLEMENT OF LOCAL CRIMINAL JUSTICE SYSTEMS WITH IMMIGRATION ENFORCEMENT ARE HISTORICALLY ANOMALOUS AND CONSTITUTIONALLY SUSPECT.**

The United States argues that federal immigration law preempts SB 54

because, in its view, the INA requires states to take steps "necessary for federal

officials to assume custody of aliens." U.S. Br. at 36. But Congress has never

required state and local law enforcement to assist in whatever way the Executive

Branch deems "necessary" to facilitate its immigration enforcement policies. More

specifically, Congress has never bestowed upon federal authorities an unchecked

power to entangle local criminal justice systems with the Executive Branch's

immigration enforcement in the ways that the United States now demands.

Congress' approach through the INA has been to invite specific, limited

cooperation from state and local governments, not to require it.[2]

For most of United States history, and at least since the enactment of federal statutes limiting immigration in the late nineteenth century, there has been a demarcation of spheres of responsibility for state and local law enforcement agencies, on the one hand, and federal immigration enforcement authorities, on the other. State and local governments bore much of the responsibility for the administration of criminal laws. Indeed, "[t]he promotion of safety of persons and property [has been] unquestionably at the core of [the states'] police power" reserved by the Tenth Amendment. *Kelley*, 425 U.S. at 247. Enforcement of immigration laws was reserved for federal officials. *See* Juliet P. Stumpf, *States of Confusion: The Rise of State and Local Power over Immigration*, 86 N.C. L. Rev. 1557, 1571-78 (2008) (describing court decisions distinguishing civil immigration enforcement from criminal enforcement and allocating the former exclusively to the federal government while recognizing the states' primary role in the latter); *Arizona*, 567 U.S. at 409 (noting that immigration enforcement decisions are the

---

[2] *See* Anil Kalhan, *Immigration Policing and Federalism Through the Lens of Technology, Surveillance, and Privacy,* 74 Ohio St. L.J. 1105, 1120–21 (2013) (observing that notwithstanding federal efforts to enlist state and local officials in immigration enforcement, "immigration federalism . . . presumes some level of self-conscious, calibrated, and negotiated choice by states and localities concerning the extent to enmesh their law enforcement agencies with immigration policing activities").

province of the federal government).

In the 1980s and 1990s, Congress enacted several anti-drug statutes that contained immigration-related provisions. "As low-level drug crime became a national obsession" during the rise of the "war on drugs" in the 1980s, local "criminal arrests were converted into a gateway for deportation." Christopher N. Lasch et al., *Understanding "Sanctuary Cities"*, 59 B.C. L. Rev. 1703, 1720-21 (2018). For example, as part of the Anti-Drug Abuse Act of 1986, Congress enacted the Narcotics Traffickers Deportation Act, which expanded the categories of individuals who would be deported for controlled substance convictions. *See* Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1751, 100 Stat. 3207 (Oct. 27, 1986). In this legislation, Congress also introduced the first statutory mention of an immigration detainer. *Id.* § 1751(d) (creating 8 U.S.C. § 1357(d)). Two years later, in the Anti-Drug Abuse Act of 1988, Congress introduced the term "aggravated felony" and made the commission of such crimes grounds for deportation. *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, §§ 7342-43, 102 Stat. 4469-70 (Nov. 18, 1988).[3]

---

[3] Commentators have observed that policymakers are still struggling to disentangle immigration law from anti-crime legislation, an entanglement that reflected a myth of immigrant criminality "reimagin[ing] noncitizens as criminal deviants and security risks." César Cuauhtémoc García Hernández, *Creating Crimmigration*, 2013 BYU L. Rev. 1457, 1458 (2013); Jennifer M. Chacón, *Unsecured Borders:*

These changes to federal law, however, were directed at federal authorities. Congress did not attempt to require state and local governments to assist the Executive Branch with carrying out its duties. In 1996, Congress added Section 287(g) to the INA, allowing the Attorney General to enter into written agreements with states or localities that *chose* to allow their officers to carry out the "function of an immigration officer."[4] 8 U.S.C. § 1357(g)(1). In addition, Congress authorized states and localities to permit their officers to make civil immigration arrests in certain narrow instances. *See* 8 U.S.C. § 1252c(a); 8 U.S.C. § 1103(a)(10). Congress also authorized the Attorney General to make payments where a state or locality entered into an *agreement* to house federal immigration detainees. *See* 8 U.S.C. § 1103(a)(11)(A). Throughout, however, Congress never *required* states and localities to assist the federal government. And, as the District Court noted, where Congress authorized state and local participation, "it

---

*Immigration Restrictions, Crime Control and National Security*, 39 Conn. L. Rev. 1827 (2007); Yolanda Vázquez, *Constructing Crimmigration: Latino Subordination in a "Post-Racial" World*, 76 Ohio St. L.J. 599, 637–42 (2015).

[4] These federal legislative efforts to entangle local criminal justice systems with federal immigration enforcement, particularly through the 287(g) program, have been "linked to racial profiling and distrust in local law enforcement." Lasch et al., *supra*, at 1727 (discussing Amada Armenta, *Protect, Serve, and Deport: The Rise of Policing as Immigration Enforcement* (2017), which concludes, based upon two-years of empirical study, that 287(g) agreement between Nashville, Tennessee jail and federal government led to racial profiling and undermined community trust in local law enforcement).

conditioned cooperation on compliance with state law." *California,* 314 F. Supp. 3d at 1106.

Over the past twenty years, however, the federal Executive Branch has increasingly attempted to pull local officers into enforcement of the federal immigration laws. *See* Lasch et al., *supra*, at 1719. The emergence of "crimmigration," or the entanglement of local criminal justice systems with federal immigration policies, has raised constitutional concerns because it upends the historical separation of federal immigration law from state and local criminal justice.

After 9/11, the federal Executive Branch began to see state and local law enforcement agencies as a potential "force multiplier" for the enforcement of federal immigration law. The push to involve local criminal agencies in immigration enforcement became more insistent, and the Executive Branch began to merge criminal justice concerns with immigration concerns in an attempt to enlist state and local officers in the federal immigration fight.[5] In 2002, for

---

[5] *See* Michael J. Wishnie, *State and Local Police Enforcement of Immigration Laws,* 6 U. Pa. J. Const. L. 1084, 1084-88 (2004) (describing the "federal effort to enlist, or even conscript, state and local police in routine immigration enforcement"); *see also* S. Karthick Ramakrishnan & Pratheepan Gulasekaram, *The Importance of the Political in Immigration Federalism,* 44 Ariz. St. L.J. 1431, 1475 (2012) (explaining that linking of immigration and crime suggested that "states and cities could and should be part of the solution").

example, the Office of Legal Counsel reversed its previous view that state and local officers did not have "inherent authority" to enforce civil immigration laws, paving the way for more states and localities to lend their officers to the federal effort.[6]  However, the 2002 opinion was undermined by the Supreme Court's decision in *Arizona*, in which the Court recognized only three "limited circumstances" in which Congress had allowed state and local officers to make civil immigration arrests.  *Arizona*, 567 U.S. at 408–09.[7]  It held that the Supremacy Clause prohibited Arizona from authorizing state and local participation beyond the "system Congress created," thus rejecting the state's premise that it had "inherent authority" to do so.  *Id.* at 408−10 (citations omitted).

---

[6] Memorandum for the Att'y Gen., from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Non-preemption of the authority of state and local law enforcement officials to arrest aliens for immigration violations* 8 (April 3, 2002); *cf.* Memorandum for Joseph R. Davis, Ass't Director, FBI, from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, *Re: Handling of INS Warrants of Deportation in Relation to NCIC Wanted Person File* (Apr. 11, 1989), *available at* https://www.scribd.com/document/24732201/DOJ-Memo-on-INS-Warrants-of-Deportation-in-Relation-to-NCIC-Wanted-Person-File-4-11-89; Memorandum for Assistant U.S. Attorney, S.D. Cal., from Teresa Wynn Roseborough, Dep. Assistant Attorney General, Office of Legal Counsel, *Assistance by State and Local Police in Apprehending Illegal Aliens* (Feb. 5, 1996), *available at* https://www.justice.gov/file/20111/download.

[7] The *Arizona* Court noted a fourth example of Congress authorizing State and local officers to perform immigration functions, which pertained to enforcement of *criminal* anti-harboring laws.  8 U.S.C. § 1324(c).

The Executive Branch has also overreached in its attempt to leverage immigration detainers to enlist the participation of local jail officials in federal immigration enforcement.  Before April 1997, the detainer form used by federal immigration officials did not request detention at all.  *See Vargas v. Swan*, 854 F.2d 1028, 1035 (7th Cir. 1988) (appendix showing Form I-247 in use from March 1983 to April 1997).  In 1997, the Executive Branch changed the form, suddenly insisting that local jails receiving detainers were *required* to detain persons otherwise entitled to release.  Form I-247 (Apr. 1997), *available at* http://bit.ly/2y7qVyS.  Federal courts, however, have since held that Congress never authorized the Executive Branch to demand mandatory detainer compliance. *See, e.g.*, *Galarza v. Szalczyk*, 745 F.3d 634, 641–45 (3d Cir. 2014).[8]

The Trump Administration's attempts to attach immigration-related funding conditions to law enforcement grants is a third example of Executive Branch overreach.  Over the past two years, the Administration, in an effort to fulfill the

---

[8] The federal government's use of immigration detainers has resulted in widespread Fourth Amendment violations and violations of the INA. *See, e.g.*, *Morales v. Chadbourne*, 996 F. Supp. 2d 19, 29 (D.R.I. 2014), *aff'd*, 793 F.3d 208 (1st Cir. 2015) ("One needs to look no further than the detainer itself . . . The fact that an investigation had been initiated is not enough to establish probable cause because the Fourth Amendment does not permit seizures for mere investigations."); *Moreno v. Napolitano*, 213 F. Supp. 3d 999 (N.D. Ill. 2016) (holding federal detainer practices routinely exceeded immigration officers' arrest authority under the INA).

President's campaign promise to "end" sanctuary cities,[9] has tried to bypass the limits on federal spending power multiple times. Federal courts, including this Court, have held that the Administration's threats to deprive sanctuary jurisdictions of federal funding violate not only statutory limits on agency authority but also the constitutional separation of powers and federalism. *See, e.g.*, *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017), *reconsideration denied,* 267 F. Supp. 3d 1201 (N.D. Cal. 2017), *appeal dismissed as moot sub nom.*, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233 (9th Cir. 2018) (striking down executive order threatening defunding on grounds of violation of separation of powers); *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) (affirming, on separation of powers grounds, district court's grant of nationwide injunction as to funding conditions imposed by Attorney General); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017) (issuing preliminary injunction as to funding conditions imposed by Attorney General on grounds that, *inter alia*, such conditions were arbitrary and capricious). In *San Francisco v. Trump*, for example, this Court explained that the Trump Administration had "not even attempted to show that Congress authorized it to withdraw federal grant moneys

---

[9] Full Text: Donald Trump Immigration Speech in Arizona (Aug. 31, 2016) (hereinafter "August 31 Speech"), *available at* http://www.politico.com/story/2016/08/donald-trump-immigration-address-transcript-227614.

11

from jurisdictions that do not agree with [its] immigration strategies" and held that the Administration therefore had violated the separation of powers in threatening to do so. 897 F.3d at 1234.

While the participation of state and local law enforcement officials in federal immigration efforts, including the exchange of information and transfers from local jails, is no longer anomalous, states retain the authority to consider the consequences of entanglement with federal immigration enforcement. Thus, state and local authorities are permitted to determine that it is in the best interests of their residents to opt out of participating in federal deportation efforts. The United States' bid to force California to participate in the current Administration's immigration enforcement plans should fare no better than previous instances of executive branch overreach. Congress has historically respected the distinct spheres of responsibility of the federal government and the state and local governments. In all of its legislative enactments concerning civil immigration arrests and detention, Congress has refrained from coopting state and local governments. This Court should likewise prevent federal authorities from conscripting state and local authorities as unwilling participants in federal immigration enforcement matters.

**II. THE STATE'S DECISION TO DISENTANGLE ITS LOCAL CRIMINAL JUSTICE SYSTEM FROM FEDERAL IMMIGRATION ENFORCEMENT IS NOT PREEMPTED BY FEDERAL LAW.**

In *Arizona*, the Supreme Court explained that federal courts should not aggressively wield preemption as a scythe to facially preempt state law. *See* 567 U.S. at 400, 415. While state law cannot stand as an obstacle to the implementation of federal statutory law, "[i]n preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Id.* at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). This presumption against preemption has particular force where the federal government has brought a facial challenge to state law and "[t]here is a basic uncertainty about what the law means and how it will be enforced." *Id.* at 415. Construing 8 U.S.C. § 1373 and the INA to preempt SB 54 on its face would supersede the historic police powers of the states and unnecessarily raise serious constitutional questions under the Tenth Amendment. To avoid these constitutional problems, this Court should affirm the district court's order denying a preliminary injunction against SB 54.

**A.** **Federal Law Should Not Be Construed To Preempt State Law Where Doing So Would Supersede the Historic Police Powers of the States and Raise Serious Constitutional Questions.**

In an era where Congress sets the metes and bounds of federal regulation, statutory interpretation has become a safeguard of federalism. When construing federal statutes, federal courts presume that "Congress legislates against the backdrop of certain unexpressed presumptions," including "those grounded in the relationship between the Federal Government and the States." *Bond v. United States*, 572 U.S. 844, 857-58 (2014) (internal quotation marks omitted). Construing federal statutes in light of these presumptions is crucial to preserving federalism "inasmuch as [the Supreme] Court . . . has left primarily to the political process the protection of the States against intrusive exercises of Congress' Commerce Clause powers." *Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991).[10]

_____

[10] Today, Congress plays the primary role in deciding whether federal law displaces state law. *See North Dakota v. United States*, 495 U.S. 423, 435 (1990) ("[T]he Court has . . . adopted a functional approach to claims of governmental immunity, accommodating the full range of each sovereign's legislative authority and *respectful of the primary role of Congress* in resolving conflicts between National and State Government.") (emphasis added). For this reason, doctrines of implied intergovernmental immunity necessarily play a lesser role where federal statutory law governs conflicts between the states and the federal government. Gillian E. Metzger, *Federalism and Federal Agency Reform*, 111 Colum. L. Rev. 1, 57 (2011) ("Much of the resultant doctrine of federal intergovernmental immunity has been cut back over time, with such concerns now addressed largely under the aegis of preemption."). Questions of federal-state conflict are answered

Several background presumptions regarding the federal system have long informed statutory construction. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. This amendment reserves police powers to the states, including over matters of local criminal justice. *See, e.g.*, *United States v. Morrison*, 529 U.S. 598, 617-18 (2000) (noting that the "Constitution requires a distinction between what is truly national and what is truly local," and consistent with this distinction, intrastate crime control "has always been the province of the States"). It also reflects a structural principle that prohibits the federal government from commandeering state legislatures and executive officials or coercing them to implement federal law. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576 (2012); *Printz v. United States*, 521 U.S. 898, 933 (1997); *New York v. United States*, 505 U.S. 144, 175-76 (1992). When construing statutes, federal courts seek to preserve the states' reserved authority. As the Supreme Court has put it, "Congress does not cavalierly pre-empt" state law. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Instead, out of respect for "the States [as] independent sovereigns in our federal system," courts should presume that federal law does not

today primarily by reference to Congress' intent, not by judicial elaboration of the implications of the Supremacy Clause. *Id.*

15

preempt state law "'unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Rice*, 331 U.S. at 230); *see also Arizona*, 567 U.S. at 400. And rather than adopt a construction that would raise serious constitutional concerns, federal courts should seek to avoid a conflict between federal and state law—particularly where, as here, the United States challenges state law as preempted on its face. *See Arizona*, 567 U.S. at 415; *cf. Murphy*, 138 S. Ct. at 1466-67 (explaining that canon of constitutional avoidance does not apply where any plausible interpretation would still violate Tenth Amendment commandeering ban).

### B. Neither 8 U.S.C. § 1373 Nor the INA Should be Construed to Preempt SB 54.

The United States seeks to enjoin provisions of SB 54 that prohibit state and local officers from (i) providing notification of inmate release dates in some instances (Cal. Gov't Code. § 7284.6(a)(1)(C)); (ii) releasing an individual's "personal information," including their home and work address (*id.* § 7284.6(a)(1)(D)); and (iii) "transferring" individuals to federal immigration officials in some instances (*id.* § 7284.6(a)(4)). According to the United States, Congress preempted these provisions on their face through 8 U.S.C. § 1373 and 8 U.S.C. §§ 1226 and 1231. But Section 1373 nowhere *requires* states and localities to assist in immigration enforcement. And Sections 1226 and 1231 are detention and removal statutes that impose obligations exclusively on *federal* officials. As

such, neither Section 1373 nor the detention and removal provisions of the INA can be construed to preempt SB 54. Doing so would supersede the historic police powers of the states and raise serious constitutional questions under the Tenth Amendment.

The United States places great weight upon 8 U.S.C. § 1373, arguing that it directly conflicts with SB 54. U.S. Br. at 48. Section 1373 provides, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). The United States' argument, however, requires a breathtakingly broad interpretation of this statute, which would effectively prevent states and localities from declining to share any and all information the federal Executive deems relevant to any "immigration status issue[]." *See* U.S. Br. at 48-49. This argument fails for two reasons.

First, the United States' construction of 8 U.S.C. § 1373 is simply implausible. Its statutory construction should be rejected on that basis alone. *See Arizona*, 567 U.S. at 400 (explaining that courts should presume state law is not

17

preempted on its face when it is plausible to construe statutory law to avoid conflict).  SB 54's savings clause expressly authorizes state and local officials to share information with federal immigration officials where such authorization is actually required by 8 U.S.C. § 1373.  *See* Cal. Gov't Code § 7284.6(e).  And even without the savings clause, SB 54 would not stand as an obstacle to implementation of Section 1373.  Contrary to the United States' proffered construction, Section 1373 plainly reaches no further than to preempt state or local prohibitions on the sharing of "information regarding [an individual's] *citizenship or immigration status.*" (emphasis added).  There is "no plausible reading" of this statute that would "encompass[] the release date of an undocumented inmate," much less an individual's home or work address or anything else the federal Executive deems possibly relevant to immigration status.  *Steinle v. City & Cnty. of San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017).  Section 1373 cannot plausibly be read to preempt facially SB 54's prohibition on the sharing of an individual's "personal information," including a home or work address, Cal. Gov't § 7284.6(a)(1)(D), nor can it be read to preempt the other challenged provisions of SB 54 on their face.

Reading Section 1373 and SB 54 harmoniously avoids a statutory construction that would supersede California's careful exercise of its core police

18

powers.  California's legislature determined that SB 54 would improve public safety by promoting cooperation between police and local communities.  *See* Cal. Gov't Code §§ 7284.2(b), (c).  This determination is not only reasonable,[11] it is also well within the core of the State's prerogative over matters of local criminal justice.  As the Supreme Court has put it, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and the vindication of its victims."  *Morrison*, 529 U.S. at 618.

Second, construing Section 1373 to preempt SB 54 on its face would raise serious constitutional questions under structural principles reflected in the Tenth Amendment.  As the Supreme Court recently reaffirmed in *Murphy*, the Constitution "withhold[s] from Congress the power to issue orders directly to the States."  138 S. Ct. at 1475.  The Court held that the Professional and Amateur Sports Protection Act ("PASPA") unconstitutionally commandeered the states by making it unlawful for a state to "authorize" sports gambling.  *See id.* at 1468 (quoting PASPA, 28 U.S.C. § 3702(1)); *id.* at 1478 (holding that PASPA's prohibition violated the anticommandeering rule).  The Court reasoned that

---

[11] *See, e.g.*, Tom Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Nat'l Immigration Law Ctr. (Jan. 26, 2017) (finding that "[c]rime is . . . significantly lower in sanctuary counties compared to nonsanctuary counties"), *available at* https://perma.cc/B57Q-XGTE.

prohibiting a state from enacting new legislation is indistinguishable from requiring it to enact legislation. *See id.* at 1478. PASPA did not purport to regulate private actors and thus to preempt state law doing the same; instead, it ran afoul of the anticommandeering rule because it operated as "a direct command to the States" to refrain from enacting legislation. *See id.* at 1481. As the District Court correctly concluded, this anticommandeering rule "counsel[s] against preemption" in this case: "[I]t is highly unlikely that Congress could have made responses to requests seeking information and/or transfers of custody mandatory," and, therefore, it is appropriate for a court to avoid that constitutional concern by concluding that Section 1373 does not preempt SB 54 on its face. *California*, 314 F. Supp. 3d at 1107.

The United States' interpretation of Section 1373 raises serious constitutional concerns under the anticommandeering rule. It would allow the federal government to unconstitutionally commander states and localities by denying them the ability to supervise their officials and could cripple their ability to "regulate in accordance with the views of the local electorate." *See New York*, 505 U.S. at 169. In particular, this interpretation of Section 1373 would deny states and localities the prerogative to decline "to provide information that belongs to the State and is available to [state and local officials] only in their official

capacity."[12] *Printz*, 521 U.S. at 932 n.17 (striking down federal statute with information-sharing provision); *cf. Murphy*, 138 S. Ct. at 1478 (holding that Congress can no more "prohibit[] a State from enacting new laws" than it can "compel a State to enact legislation," because the "basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event").[13] *See* Cal. Gov't Code § 7284.6(a)(1)(C)-(D); *id.* § 7284.6(e). The United States' demands for additional information sharing could easily require several full-time employees in a large police force or corrections agency. *Cf. City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 873 (N.D. Ill. 2018) (holding 8 U.S.C. § 1373 facially unconstitutional because, *inter alia*, it "requires local policymakers to stand aside and allow the federal government to conscript the time and cooperation of local employees"). Denying states the authority to adopt reasonable and targeted policies to disentangle local criminal justice systems from federal immigration

---

[12] *See* Robert A. Mikos, *Can the States Keep Secrets from the Federal Government?*, 161 U. Pa. L. Rev. 103, 159-64 (2012) (arguing that information-sharing statutes such as Section 1373 violate anti-commandeering principle of *Printz*); *see also* Kalhan, *supra* note 1, 74 Ohio St. L.J. at 1159-62 (arguing the positive benefits of "information federalism").

[13] Because California has sought to protect only information that has not been shared with the public, the State has not adopted a "policy of no-voluntary-cooperation that does not protect confidential information generally." *City of New York v. United States*, 179 F.3d 29, 37 (2d Cir. 1999) (declining to strike down Section 1373 on its face but explaining that City's Tenth Amendment concerns were "not insubstantial").

enforcement in this way would diminish political accountability and would shift regulatory burdens to the states. This forced entanglement of local criminal justice and federal immigration enforcement would, in turn, inflict the very harms that the Supreme Court's anticommandeering prohibition is designed to prevent. *See Murphy*, 138 S. Ct. at 1478 (explaining potential harms that anticommandeering rule addresses).

In short, the United States cannot eliminate the anticommandeering concern that its interpretation of Section 1373 raises by recharacterizing that interpretation as one involving preemption, just as it could not in *Murphy* avoid the anticommandeering violation that PASPA created by pointing to preemption doctrine. *See Murphy*, 138 S. Ct. at 1479 (rejecting United States' argument that "anti-authorization prohibition [of PASPA] constitutes a valid preemption provision"). The United States argues that its interpretation does not raise anticommandeering concerns but instead merely "[p]revent[s] states from adopting a policy" concerning immigration. U.S. Br. at 43. But as in *Murphy*, "there is simply no way to understand" the United States' interpretation of Section 1373 as anything other than as an unconstitutional command to states. *See* 138 S. Ct. at 1481; *City of Chicago*, 321 F. Supp. 3d at 873 (finding Section 1373 unconstitutional); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 329-31

22

(E.D. Pa. 2018) (same); *City and Cty. of San Francisco v. Sessions*, No. 17-cv-04642 (WHO), 2018 WL 4859528 (N.D. Cal. Oct 5, 2018) (same).

The United States' other argument is even further off the mark. It argues that 8 U.S.C. §§ 1226 and 1231 preempt SB 54 on their face because they impliedly require states and localities to assist in federal immigration enforcement after an individual is released from local criminal custody. U.S. Br. at 36-38. But Sections 1226 and 1231 plainly do no such thing. Congress enacted Section 1226(c)(1) in 1996, directing the Attorney General to take certain noncitizens into custody, in response to what it perceived to be a "wholesale failure *by the INS*" to remove deportable noncitizens who had been convicted of criminal offenses by "fail[ing] to detain [them] . . . during their deportation proceedings." *Demore v. Kim*, 538 U.S. 510, 518-21 (2003) (emphasis added). Congress directed that noncitizens taken into federal custody and placed in removal proceedings upon release from criminal custody are to be mandatorily detained, whereas those apprehended after returning to the community for some time or under other circumstances are to be detained at the discretion of immigration authorities. *Compare* 8 U.S.C. § 1226(c) *with* § 1226(a). Section 1231(a)(1)(B), which the United States also cites, requires federal immigration authorities to act quickly to remove a noncitizen at the conclusion of removal proceedings. If an order of

23

removal becomes final while a noncitizen is still confined in criminal custody, then the removal period does not begin to run until after the noncitizen is released. *Id.* §§ 1231(a)(1)(B)(i)-(iii). The upshot is that Sections 1226 and 1231 impose obligations on *federal* officials but were not intended to disturb the prerogative of state and local officials to decide whether they would voluntarily cooperate with requests from federal immigration authorities. Indeed, if they were intended to command the participation of states and localities, they would violate the Tenth Amendment. *See Murphy*, 138 S. Ct. at 1478; *Galarza*, 745 F. 3d at 644–45 (relying on *New York* and *Printz* to find that construing "a federal detainer filed with a state or local [law enforcement agency] [as] a command . . . would violate the anti-commandeering doctrine of the Tenth Amendment."); *id.* at 641 (noting that Congress did not "authorize federal officials to command state or local officials to detain suspected aliens subject to removal").

While the United States suggests that *Arizona* requires the Court to find a conflict between SB 54 and federal law, *see* U.S. Br. at 38-39, the Supreme Court's holding in that case requires just the opposite. *Arizona* concerned a state's attempt to entangle its criminal enforcement system with the enforcement of federal immigration law. *See* 567 U.S. at 406-10. Here, by contrast, California has decided with SB 54 to *disentangle* its local criminal justice apparatus from federal

immigration enforcement.  The question is whether federal statutory law preempts

that decision on its face.  *Arizona* instructs that a court answering that question

must presume that state law is not preempted unless Congress has clearly indicated

otherwise.  *See id.* at 400.  Because Congress has not clearly required state and

local officials to accede to the Trump Administration's demands, which themselves

raise serious constitutional questions under the Tenth Amendment, this Court

should conclude that SB 54 is not preempted.

## CONCLUSION

*Amici* urge the Court to affirm the District Court's order denying the United States' motion for a preliminary injunction with respect to SB 54.

Date: November 13, 2018

Respectfully submitted,

/s/ Harry Sandick_____

Harry Sandick
Michael D. Schwartz
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
hsandick@pbwt.com
mschwartz@pbwt.com

Kevin A. Calia
Law Office of Kevin A. Calia
1478 Stone Point Drive, Suite 100
Roseville, CA 95661
(916) 547-4175
kevin@calialaw.com

*Attorneys for Amici Curiae*

# APPENDIX A[*]

Kathryn Abrams
Professor of Law
University of California, Berkeley School of Law

Amna A. Akbar
Associate Professor of Law
The Ohio State University, Moritz College of Law

Carolina Antonini
Adjunct Professor
Georgia State University, College of Law

Sabi Ardalan
Assistant Clinical Professor
Harvard Law School

Jon Bauer
Clinical Professor of Law and Richard D. Tulisano '69 Scholar in Human Rights
University of Connecticut School of Law

Steven W. Bender
Professor of Law
Seattle University School of Law

Henry Allen Blair
Robins Kaplan Distinguished Professor
Mitchell Hamline School of Law

Linda Bosniak
Distinguished Professor of Law
Rutgers Law School

---

[*] *Amici curiae* appear in their individual capacities; institutional affiliations are provided here for identification purposes only.

Jason A. Cade
Associate Professor of Law
University of Georgia School of Law

Benjamin Casper Sanchez
Director, James H. Binger Center for New Americans
University of Minnesota Law School

Linus Chan
Associate Professor of Clinical Law
University of Minnesota Law School

Matthew H. Charity
Professor of Law
Western New England University

Erwin Chemerinsky
Dean and Jesse H. Choper Distinguished Professor of Law
University of California, Berkeley School of Law

Gabriel J. Chin
Edward L. Barrett Jr. Chair and Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

Marisa S. Cianciarulo
Associate Dean for Academic Affairs, Doy & Dee Henley Chair in Law
Chapman University Fowler School of Law

Dr. Neil H. Cogan
Professor of Political Science
Whittier College

David S. Cohen
Professor of Law
Drexel University Thomas R. Kline School of Law

Seth Davis
Professor of Law
University of California, Berkeley School of Law

Ingrid Eagly
Professor of Law
UCLA School of Law

Stella Burch Elias
Professor of Law
University of Iowa College of Law

Lauren Gilbert
Professor of Law
St. Thomas University School of Law

Joseph Harbaugh
Dean Emeritus and Professor Emeritus
Nova Southeastern College of Law

Dina Francesca Haynes
Professor of Law
New England Law

Aziz Huq
Frank and Bernice J. Greenberg Professor of Law
University of Chicago Law School

Alan Hyde
Distinguished Professor
Rutgers Law School

Ulysses Jaen
Director & Asst. Professor
Ave Maria School of Law

Kevin R. Johnson
Dean and Mabie-Apallas Professor of Public Interest Law and Chicana/o Studies
University of California, Davis School of Law

Michael Kagan
Joyce Mack Professor of Law & Director of the UNLV Immigration Clinic
William S. Boyd School of Law
University of Nevada, Las Vegas

Anil Kalhan
Professor of Law
Drexel University Kline School of Law

Jennifer Lee Koh
Professor of Law
Western State College of Law

Christopher N. Lasch
Professor of Law
University of Denver Sturm College of Law

Karen J. Pita Loor
Clinical Associate Professor of Law
Boston University School of Law

Fatma Marouf
Professor of Law
Texas A&M University School of Law

Elizabeth McCormick
Associate Clinical Professor of Law
University of Tulsa College of Law

Nancy Morawetz
Professor of Clinical Law
New York Univeristy School of Law

Hiroshi Motomura
Susan Westerberg Prager Distinguished Professor of Law
School of Law, University of California, Los Angeles (UCLA)

Elora Mukherjee
Jerome L. Greene Clinical Professor of Law
Director, Immigrants' Rights Clinic
Columbia Law School

Karen Musalo
Professor, Bank of America Chair in International Law
UC Hastings College of the Law

William Quigley
Professor of Law
Loyola University New Orleans

Sarah Rogerson
Clinical Professor of Law
Director, Immigration Law Clinic
Albany Law School

Tom Romero, II, J.D., Ph.D.
Associate Professor of Law
University of Denver Sturm College of Law

Carrie Rosenbaum
Adjunct Professor
Golden Gate University School of Law

Rachel E. Rosenbloom
Professor of Law
Northeastern University School of Law

Juliet P. Stumpf
Robert E. Jones Professor of Advocacy and Ethics
Lewis & Clark Law School

David B. Thronson
Professor of Law and Associate Dean for Academic Affairs
Michigan State University College of Law

Katharine Tinto
Clinical Professor of Law
UC Irvine School of Law

Philip L. Torrey
Managing Attorney, Harvard Immigration and Refugee Clinical Program
Harvard Law School

Mary Pat Treuthart
Professor of Law
Gonzaga University School of Law

Laurence H. Tribe
Carl M. Loeb University Professor and Professor of Constitutional Law
Harvard Law School

Enid Trucios-Haynes
Professor of Law
Louis D. Brandeis School of Law, University of Louisville

Diane Uchimiya
Professor of Law and Director of the Justice and Immigration Clinic
University of La Verne College of Law

Julia Vazquez
Associate Clinical Professor of Law
Southwestern Law School

Leti Volpp
Robert D. and Leslie Kay Raven Professor of Law
UC Berkeley School of Law

Robin Walker Sterling
Ronald V. Yegge Clinical Director and Associate Professor
University of Denver Sturm College of Law

Lindsey Webb
Associate Professor
University of Denver Sturm College of Law

Jonathan Weinberg
Associate Dean for Research & Faculty Development and Professor of Law
Wayne State University

Deborah M. Weissman
Reef C. Ivey Distinguished Professor of Law
University of North Carolina School of Law

Richard A. Wilson
Professor
University of Connecticut

Mark E. Wojcik
Professor of Law
The John Marshall Law School

<u>**CERTIFICATE OF COMPLIANCE**</u>

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,715 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

/s/ Harry Sandick_____
Attorney for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2018, I electronically filed the foregoing Brief of *Amici Curiae* Administrative Law, Constitutional Law, Criminal Law and Immigration Law Scholars in Support of Defendants-Appellees using the CM/ECF system, which will send notification of such filing to all parties of record.

/s/ Harry Sandick_____
Attorney for *Amici Curiae*

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28.1-1(f),
29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** 18-16496

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28.1-1.
The brief is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is [5,715] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated [_____]
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2
(a) and is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is [_____] words or [_____] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

| Signature of Attorney or Unrepresented Litigant | /s/ Harry Sandick | Date | 11/13/2018 |

("s/" plus typed name is acceptable for electronically-filed documents)

*(Rev.12/1/16)*

| 9th Circuit Case Number(s) | 18-16496 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) 11/13/18 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | /s/ Harry Sandick

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)