**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellant,* <br><br> v. <br><br> STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California; XAVIER BECERRA, Attorney General of California, *Defendants-Appellees.* | No. 18-16496 <br><br> D.C. No. 2:18-cv-00490-JAM-KJN <br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted March 13, 2019
San Francisco, California

Filed April 18, 2019

Before: MILAN D. SMITH, JR., PAUL J. WATFORD,
and ANDREW D. HURWITZ, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

# SUMMARY*

## Immigration

In a case in which the United States sought to enjoin the enforcement of three laws California enacted expressly to protect its residents from federal immigration enforcement, the panel affirmed in part and reversed in part the district court's denial in large part of the United States' motion for a preliminary injunction.

The United States challenged three California laws: AB 450, which—as relevant to this appeal—requires employers to alert employees before federal immigration inspections; AB 103, which imposes inspection requirements on facilities that house civil immigration detainees; and SB 54, which limits the cooperation between state and local law enforcement and federal immigration authorities.

The United States sought a preliminary injunction, arguing that these laws violated the doctrine of intergovernmental immunity and the doctrine of conflict preemption. The district court concluded that the United States was unlikely to succeed on the merits of many of its claims, and so denied in large part the motion for a preliminary injunction.

With respect to AB 450, which requires employers to alert employees before federal immigration inspections, the panel affirmed the district court's denial of a preliminary

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

injunction. The panel rejected the United States' contention that the provisions are invalid under the doctrine of intergovernmental immunity and the doctrine of conflict preemption, concluding that the district court did not abuse its discretion when it concluded that AB 450's employee-notice provisions neither burden the federal government nor conflict with federal activities.

With respect to AB 103, which imposes inspection requirements on facilities that house civil immigration detainees, the panel affirmed the denial of a preliminary injunction as to those provisions of AB 103 that duplicate inspection requirements otherwise mandated under California law and are imposed on state and local detention facilities.

However, the panel concluded that one subsection of AB 103—California Government Code section 12532(b)(1)(C), which requires examination of the circumstances surrounding the apprehension and transfer of immigration detainees—discriminates against and impermissibly burdens the federal government, and so is unlawful under the doctrine of intergovernmental immunity. Specifically, the panel concluded that the district court erred by relying on a de minimis exception to the doctrine of intergovernmental immunity in analyzing this provision. The panel concluded that Supreme Court case law compels the rejection of such a de minimis exception and held that *any* economic burden that is discriminatorily imposed on the federal government is unlawful. The panel also concluded that the district court was incorrect in concluding that the review required by the provision appeared no more burdensome than reviews required under other California provisions. Therefore, the panel reversed the district court's

denial of a preliminary injunction as to California Government Code section 12532(b)(1)(C).

With respect to SB 54, which limits the cooperation between state and local law enforcement and federal immigration authorities, the panel affirmed the district court's denial of a preliminary injunction. The panel rejected the United States' argument that the provisions violate the doctrine of obstacle preemption and the doctrine of intergovernmental immunity, concluding that the district court did not abuse its discretion when it concluded that any obstruction caused by SB 54 is consistent with California's prerogatives under the Tenth Amendment and the anticommandeering rule.

The panel also rejected the United States' contention that SB 54's information-sharing restrictions—which prohibit state and local law enforcement agencies from providing information regarding a person's release date from incarceration or other personal information—conflict with 8 U.S.C. § 1373, which provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [the Department of Homeland Security] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." Although SB 54 expressly permits the sharing of information about immigration status, the United States argued that section 1373 actually applies to more information than just immigration status, and hence that SB 54's prohibition on sharing *other* information created a direct conflict. The panel disagreed, explaining that the language of section 1373 is naturally understood as a reference to a person's legal classification under federal law.

Finally, the panel addressed California's argument that the three other factors for determining whether to issue a preliminary injunction—irreparable harm, the balance of the equities, and the public interest—provide an alternative basis for affirming the district court's denial of a preliminary injunction. Because the panel concluded that the United States is unlikely to succeed on the merits of its challenges to AB 450 and SB 54, the panel considered these factors only as applied to the provision of AB 103 that imposes an impermissible burden on the federal government. The panel concluded it was not prepared, in the first instance, to affirm the district court's denial of a preliminary injunction as to this provision based on equitable considerations. However, the panel encouraged the district court, on remand, to reexamine the equitable factors in light of the evidence in the record.

## COUNSEL

Daniel Tenny (argued), Brad Hinshelwood, Laura Myron, Katherine Twomey Allen, Daniel Tenny, and Mark B. Stern, Appellate Staff; Hashim M. Mooppan, Deputy Assistant Attorney General; McGregor Scott, United States Attorney; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; Joshua S. Press, Francesca Genova, Joseph A. Darrow, and Lauren C. Bingham, Trial Attorneys; Erez Reuveni, Assistant Director; August Flentje, Special Counsel; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Plaintiff-Appellant.

Aimee Feinberg (argued), Deputy Solicitor General; Kristin Liska, Associate Deputy Solicitor General; Lee I. Sherman,

Maureen C. Onyeagbako, and Cherokee DM Melton, Deputy Attorneys General; Christine Chuang, Anthony Hakl, and Satoshi Yanai, Supervising Deputy Attorneys General; Thomas S. Patterson, Senior Assistant Attorney General; Edward C. DuMont, Solicitor General; Xavier Becerra, Attorney General; Office of the Attorney General, Sacramento, California; for Defendants-Appellees.

David L. Caceres, Assistant City Attorney; Lonnie J. Eldridge, City Attorney; Office of the City Attorney, Simi Valley, California; for Amicus Curiae City of Simi Valley.

Anthony S. Chavez, Daniel L. Richards, and Matthew E. Richardson, Best Best & Krieger LLP, Irvine, California, for Amicus Curiae City of Lake Forest.

Christopher J. Hajec, Elizabeth A. Hohenstein, and Mark S. Venezia, Immigration Reform Law Institute, Washington, D.C., for Amici Curiae National Law Enforcement Associations and Victims' Organizations.

Kyle D. Hawkins, Solicitor General; Ari Cuenin and Eric A. White, Assistant Solicitors General; Jeffrey C. Mateer, First Assistant Attorney General; Ken Paxton, Attorney General; Office of the Attorney General, Austin, Texas; for Amici Curiae States of Texas, Alabama, Arkansas, Florida, Georgia, Indiana, Kansas, Louisiana, Nebraska, Nevada, Ohio, Oklahoma, South Carolina, West Virginia, and Governor Phil Bryant of the State of Mississippi.

Lawrence J. Joseph, Law Office of Lawrence J. Joseph, Washington, D.C.; Sarah R. Rehlberg and Dale L. Wilcox, Immigration Reform Law Institute, Washington, D.C.; for Amici Curiae Municipalities and Elected Officials.

John P. Cooley, Senior Deputy County Counsel; Thomas E. Montgomery, County Counsel; Office of County Counsel, San Diego, California; for Amicus Curiae County of San Diego.

Sara J. Eisenberg, Aileen M. McGrath, and Tara M. Steeley, Deputy City Attorneys; Yvonne R. Mere, Chief of Complex and Affirmative Litigation; Ronald P. Flynn, Chief Deputy City Attorney; Jesse C. Smith, Chief Assistant City Attorney; Dennis J. Herrera, City Attorney; Office of the City Attorney, San Francisco, California; for Amicus Curiae City and County of San Francisco.

Benjamin G. Shatz, Michael G. Nordon, and Esra A. Hudson, Manatt Phelps & Phillips LLP, Los Angeles, California, for Amici Curiae Faith-Based Organizations.

Harit U. Trivedi, Strefan Fauble, Valerie L. Flores, Deputy City Attorneys; James P. Clark, Chief Deputy  City Attorneys; Leela A. Kapur, Chief of Staff; Michael N. Feuer, City Attorney; Office of the City Attorney, Los Angeles, California; for Amicus Curiae City of Los Angeles.

David M. Zionts, Ivano M. Ventresca, and Eric H. Holder Jr., Covington & Burling LLP, Washington, D.C.; Jessica R. Hanson and Daniel N. Shallman, Covington & Burling LLP, Los Angeles, California; for Amicus Curiae California State Senate.

Matthew J. Piers, Caryn C. Lederer, and Chirag G. Badlani, Hughes Socol Piers Resnick & Dym Ltd., Chicago, Illinois;

Daniel B. Rice, Joshua A. Geltzer, and Mary B. McCord, Institute for Constitutional Advocacy and Protection,

Washington, D.C.; for Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders.

Fredrick S. Levin, Daniel R. Paluch, Ali M. Abughedia, and Michael A. Rome, Santa Monica, California, for Amicus Curiae American Jewish Committee.

Bradley S. Phillips and Gregory D. Phillips, Munger Tolles & Olson LLP, Los Angeles, California, for Amici Curiae Immigration, Labor and Employment Law Scholars re: AB 450.

Harry Sandick and Michael D. Schwartz, Patterson Belknap Webb & Tyler LLP, New York, New York; Kevin A. Calla, Law Office of Kevin A. Calla, Roseville, California; for Amici Curiae Administrative Law, Constitutional Law, Criminal Law and Immigration Law Scholars.

Margaret L. Carter and Daniel R. Suvor, O'Melveny & Myers LLP, Los Angeles, California; Erin Bernstein and Malia McPherson, Deputy City Attorneys, Maria Bee, Chief Assistant City Attorney; Barbara J. Parker, City Attorney; Office of the City Attorney, Oakland, California; Javier Serrano, Deputy County Counsel; Kavita Narayan, Lead Deputy County Counsel; Greta S. Hansen, Chief Assistant County Counsel; James R. Williams, County Counsel; Office of the County Counsel, San Jose, California; for Amici Curiae 29 California Counties, Cities, and Local Officials.

Abigail K. Coursolle, Ian McDonald, Joe McLean, and Sarah Grusin, National Health Law Program, Los Angeles, California, for Amici Curiae National Health Law Program, Asian Law Alliance; Bay Area Lawyers for Individual Freedom; California Center for Rural Policy; California

National Organization for Women; Center for Civil Justice; Center for Medicare Advocacy, Inc.; Citizens for Choice; Community Legal Aid Society, Inc.; Congregation of Our Lady of Charity of the Good Shepherd, US Provinces; CWDA; Desert AIDS Project; Disability Rights California; Disability Rights Education and Defense Fund; Disability Rights Legal Center; Equality California; Florida Legal Services, Inc.; In Our Own Voice: National Black Women's Reproductive Justice Agenda; Kentucky Equal Justice Center; Legal Aid Justice Center; Legal Aid Society of San Mateo County; Legal Council for Health Justice; Maternal and Child Health Access; Medical Students for Choice; National Asian Pacific American Families Against Substance Abuse; NARAL Pro-Choice California; National Asian Pacific American Women's Forum; National Center for Law and Economic Justice; National Hispanic Medical Association; National Institute for Reproductive Health; National Organization for Women Foundation; National Women's Law Center; Northwest Health Law Advocates; Physicians for Reproductive Health; Planned Parenthood Affiliates of California; Positive Women's Network – USA; Public Justice Center; The Children's Partnership; The New York Immigration Coalition; The Praxis Project; The Sargent Shriver National Center on Poverty Law; The Southwest Women's Law Center; and Western Center on Law & Poverty.

MacKenzie Fillow, John Moore, Noah Kazis, Aaron Bloom, and Richard Dearing, Of Counsel; Zachary W. Carter, Corporation Counsel; New York City Law Department, New York, New York, for Amici Curiae City of New York and 21 Local Governments.

**OPINION**

M. SMITH, Circuit Judge:

Defendant-Appellee State of California (California) enacted three laws expressly designed to protect its residents from federal immigration enforcement: AB 450, which requires employers to alert employees before federal immigration inspections; AB 103, which imposes inspection requirements on facilities that house civil immigration detainees; and SB 54, which limits the cooperation between state and local law enforcement and federal immigration authorities. Plaintiff-Appellant United States of America (the United States) challenged these enactments under the Supremacy Clause and moved to enjoin their enforcement. The district court concluded that the United States was unlikely to succeed on the merits of many of its claims, and so denied in large part the motion for a preliminary injunction.

The district court did not abuse its discretion when it concluded that AB 450's employee-notice provisions neither burden the federal government nor conflict with federal activities, and that any obstruction caused by SB 54 is consistent with California's prerogatives under the Tenth Amendment and the anticommandeering rule. We therefore affirm the district court's denial of a preliminary injunction as to these laws. We also affirm the denial of a preliminary injunction as to those provisions of AB 103 that duplicate inspection requirements otherwise mandated under California law. But we conclude that one subsection of AB 103—codified at California Government Code section 12532(b)(1)(C)—discriminates against and impermissibly burdens the federal government, and so is unlawful under the doctrine of intergovernmental immunity. Because the

district court relied on incorrect law in analyzing this provision, we reverse its preliminary injunction order in part.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Factual Background

We first review the relevant federal statutory framework before describing the three California laws at issue in this case.

#### A.  Federal Statutory Framework

##### i.  The INA

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States* (*Arizona II*), 567 U.S. 387, 394 (2012); *see also* U.S. Const. art. I, § 8, cl. 4 (granting Congress the power to "establish an uniform Rule of Naturalization"); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 315–18 (1936) (exploring the federal government's inherent sovereign powers in the realm of foreign affairs).  Congress exercises its authority to regulate the entry, presence, and removal of noncitizens through the Immigration and Nationality Act (INA) and other related laws, and "has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona II*, 567 U.S. at 396.  "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Id*.  For example, "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States," and until that decision, federal officials generally may either detain her or release her on bond.  8 U.S.C. § 1226(a).  Detention is mandatory, however, for certain categories of noncitizens,

including those who are inadmissible or removable due to criminal convictions.  *Id.* § 1226(c).

"The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," which might include the "purchase or lease of [an] existing prison, jail, detention center, or other comparable facility suitable for such use." *Id.* § 1231(g); *see also id.* § 1103(a)(11) (permitting agreements with states and localities "for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention").   The United States notes that the Department of Homeland Security (DHS) "regularly uses nine facilities in California to house civil immigration detainees," which collectively have a capacity of approximately 5,700 detainees.  The interplay between federal and state authorities also manifests itself when noncitizens subject to removal are also the targets of state or local criminal enforcement.  The INA requires that DHS remove an alien who is subject to a final removal order "within a period of 90 days" from "the date the alien is released from [state or local] detention or confinement"; however, it "may *not* remove an alien who is sentenced to imprisonment    until    the    alien    is    released    from imprisonment."    *Id.*  § 1231(a)(1), (4) (emphasis added). After release, federal authorities "shall detain the alien," and "[u]nder no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible . . . or deportable." *Id.* § 1231(a)(2).

The United States asserts that "Congress contemplated cooperation between federal and state officials" when it allowed noncitizens to complete state criminal custody before removal, and points to "other provisions of the INA

[that] likewise reflect that expectation of collaboration." For example, the federal government is required to make information available to state and local authorities indicating "whether individuals arrested . . . for aggravated felonies are aliens," and to provide liaisons and computer resources in connection with aliens charged with aggravated felonies. *Id.* § 1226(d)(1). Additionally, DHS must respond to inquiries from state or local officials "seeking to verify or ascertain the citizenship or immigration status of any individual." *Id.* § 1373(c). In turn, "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a). Additionally, "[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer," such as "when the Attorney General has granted that authority to specific officers in a formal agreement with a state or local government." *Arizona II*, 567 U.S. at 408 (citing 8 U.S.C. §§ 1103(a)(10), 1252c, 1324(c), 1357(g)(1)). "State officials can also assist the Federal Government by responding to requests for information about when an alien will be released from their custody." *Id.* at 410.

### ii. The IRCA

Congress enacted the Immigration Reform and Control Act of 1986 (IRCA) "as a comprehensive framework for 'combating the employment of illegal aliens.'" *Arizona II*, 567 U.S. at 404 (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002)). Under the IRCA, employers may not knowingly hire or employ aliens without proper work authorization. 8 U.S.C. § 1324a(a)(1)–(2). Employers in violation of the IRCA are subject to civil and,

in cases of "a pattern or practice of violations," criminal penalties. *Id.* § 1324a(e)–(f). Although the IRCA

> does not impose federal criminal sanctions on the employee side . . . . some civil penalties are imposed instead. With certain exceptions, aliens who accept unlawful employment are not eligible to have their status adjusted to that of a lawful permanent resident. Aliens also may be removed from the country for having engaged in unauthorized work. In addition to specifying these civil consequences, federal law makes it a crime for unauthorized workers to obtain employment through fraudulent means.

*Arizona II*, 567 U.S. at 404–05 (citations omitted).

To ensure compliance with the IRCA, employers must verify the authorization statuses of prospective employees. 8 U.S.C. § 1324a(a)(1)(B), (b). Verification is facilitated through a uniform inspection process; employers are required to retain documentary evidence of authorized employment, to which "immigration officers and administrative law judges [] have reasonable access." *Id.* § 1324a(b), (e)(2)(A). The information and documentation associated with the verification process may only be used to enforce the IRCA and INA, as well as for prosecution under certain criminal statutes. *Id.* § 1324a(b)(5), (d)(2)(F)–(G).

## B.  California's Statutes

This case centers on three laws enacted by the California legislature with the express goal "of protecting immigrants from an expected increase in federal immigration enforcement actions." *Hearing on AB 450 Before the*

*Assemb. Comm. on Judiciary*, 2017–18 Sess. 1 (Cal. 2017) (synopsis).

### i.   Immigrant Worker Protection Act (AB 450)

AB 450 prohibits "public and private employers" from "provid[ing] voluntary consent to an immigration enforcement agent to enter any nonpublic areas of a place of labor," unless "the immigration enforcement agent provides a judicial warrant." Cal. Gov't Code § 7285.1(a), (e). It similarly prohibits employers from "provid[ing] voluntary consent to an immigration enforcement agent to access, review, or obtain the employer's employee records without a subpoena or judicial warrant." *Id.* § 7285.2(a)(1). It also limits employers' ability to "reverify the employment eligibility of a current employee at a time or in a manner not required by" the IRCA. Cal. Lab. Code § 1019.2(a).

In addition, AB 450 requires employers to "provide a notice to each current employee, by posting in the language the employer normally uses to communicate employment-related information to the employee, of any inspections of I-9 Employment Eligibility Verification forms or other employment records conducted by an immigration agency within 72 hours of receiving notice of the inspection." *Id.* § 90.2(a)(1).[1] If an employer receives "the written immigration agency notice that provides the results of the inspection," then she must provide a copy to each "employee identified by the immigration agency inspection results to be an employee who may lack work authorization" and each

---

[1] AB 450 "does not require a penalty to be imposed upon an employer or person who fails to provide notice to an employee at the express and specific direction or request of the federal government." Cal. Lab. Code § 90.2(c).

"employee whose work authorization documents have been identified by the immigration agency inspection to have deficiencies." *Id.* § 90.2(b)(1)–(2).

### ii. Inspection and Review of Facilities Housing Federal Detainees (AB 103)

AB 103 requires the California Attorney General to conduct "reviews of county, local, or private locked detention facilities in which noncitizens are being housed or detained for purposes of civil immigration proceedings in California." Cal. Gov't Code § 12532(a).[2] This includes "any county, local, or private locked detention facility in which an accompanied or unaccompanied minor is housed or detained on behalf of, or pursuant to a contract with, the federal Office of Refugee Resettlement or the United States Immigration and Customs Enforcement." *Id.* It requires the California Attorney General to review "the conditions of confinement," "the standard of care and due process provided," and "the circumstances around [the] apprehension" of civil immigration detainees, and then prepare "a comprehensive report outlining the findings of the review." *Id.* § 12532(b). To facilitate this review, the California Attorney General "shall be provided all necessary access for the observations necessary to effectuate reviews required pursuant to this section, including, but not limited to, access to detainees, officials, personnel, and records." *Id.* § 12532(c).

### iii. California Values Act (SB 54)

---

[2] California law generally requires biennial inspections of "local detention facilities," focusing on health and safety, fire suppression, security, and rehabilitation efforts. Cal. Penal Code § 6031.1(a).

SB 54 limits law enforcement's "discretion to cooperate with immigration authorities." *Id.* § 7282.5(a). Among other things, it prohibits state and local law enforcement agencies from "[i]nquiring into an individual's immigration status"; "[d]etaining an individual on the basis of a hold request"; "[p]roviding information regarding a person's release date or" other "personal information," such as "the individual's home address or work address"; and "[a]ssisting immigration authorities" in certain activities. *Id.* § 7284.6(a)(1). SB 54 contains some exceptions to these prohibitions. For example, although agencies generally cannot "[t]ransfer an individual to immigration authorities," such an undertaking is permissible if "authorized by a judicial warrant or judicial probable cause determination," or if the individual has been convicted of certain enumerated crimes. *Id.* §§ 7282.5(a), 7284.6(a)(4). Similarly, the restrictions on sharing personal information are also relaxed if the individual has been convicted of an enumerated crime, or if the information is available to the public. *Id.* §§ 7282.5(a), 7284.6(a)(1)(C)–(D).[3]

---

[3] California asserts that SB 54 was motivated by its "recogni[tion] that victims and witnesses of crime are less likely to come forward if they fear that an interaction with law enforcement will lead to their removal or the removal of a family member," and that the law built upon prior legislative efforts. *See* Cal. Penal Code § 422.93 ("Whenever an individual who is a victim of or witness to a hate crime . . . is not charged with or convicted of committing any crime under state law, a peace officer may not detain the individual exclusively for any actual or suspected immigration violation or report or turn the individual over to federal immigration authorities."); *see also* Cal. Gov't Code § 7284.2 (outlining the legislative findings undergirding SB 54 and reporting that "immigrant community members fear approaching police" and "[e]ntangling state and local agencies with federal immigration enforcement programs diverts already limited resources and blurs the lines of accountability between local, state, and federal governments").

## II. Procedural Background

On March 6, 2018, the United States filed this action against California, alleging that AB 450, AB 103, and SB 54 are preempted and violate the Supremacy Clause. The United States moved to preliminarily enjoin the three laws.

The district court granted the motion for a preliminary injunction in part and denied it in part. *United States v. California* (*California I*), 314 F. Supp. 3d 1077, 1112 (E.D. Cal. 2018). It agreed that the United States was likely to succeed on the merits as to two provisions of AB 450—specifically, the restriction on employers' voluntary consent to immigration enforcement officers, which the court concluded "impermissibly discriminates against those who choose to deal with the Federal Government," and AB 450's reverification provision, which it determined was likely preempted. *Id.* at 1096, 1098.[4] However, the court found "no merit to [the United States'] Supremacy Clause claim as to" AB 450's employee-notice provisions, reasoning, "Given IRCA's focus on employers, the Court finds no indication—express or implied—that Congress intended for employees to be kept in the dark." *Id.* at 1097. The notice provisions did not "violate the intergovernmental immunity doctrine," the district court continued, because "[a]n employer is not punished for its choice to work with the Federal Government, but for its failure to communicate with its employees." *Id.*

As to AB 103, the district court found "no indication in the cited portions of the INA that Congress intended for

---

[4] California does not appeal the partial grant of the United States' motion.

States to have no oversight over detention facilities operating within their borders," noting that

> AB 103's review process does not purport to give California a role in determining whether an immigrant should be detained or removed from the country. The directive contemplates increased transparency and a report that may serve as a baseline for future state or local action. At this point, what that future action might be is subject to speculation and conjecture.

*Id.* at 1091. It further concluded that AB 103 was not invalid under the doctrine of intergovernmental immunity because "the burden placed upon the facilities is minimal," and "even if AB 103 treats federal contractors differently than the State treats other detention facilities," the United States had not demonstrated that California "treats other facilities better than those contractors." *Id.* at 1093.

The district court also refused to enjoin the challenged provisions of SB 54, finding that California's "decision not to assist federal immigration enforcement in its endeavors is not an 'obstacle' to that enforcement effort" because "refusing to help is not the same as impeding," and thus the doctrine of obstacle preemption did not render the provisions unlawful. *Id.* at 1104–05. It also found that "Tenth Amendment and anticommandeering principles counsel against preemption," and that 8 U.S.C. § 1373, which governs the exchange of "information regarding [] immigration status," did not change this conclusion because the "plain meaning of Section 1373 limits its reach to information strictly pertaining to immigration status (i.e. what one's immigration status is) and does not include

information like release dates and addresses." *Id.* at 1102, 1107. The district court determined that "a Congressional mandate prohibiting states from restricting their law enforcement agencies' involvement in immigration enforcement activities—apart from, perhaps, a narrowly drawn information sharing provision—would likely violate the Tenth Amendment." *Id.* at 1109–10.

Subsequently, the district court ruled on California's motion to dismiss, issuing an order consistent with its conclusions as to the preliminary injunction. *United States v. California* (*California II*), No. 2:18-cv-490-JAM-KJN, 2018 WL 3361055, at *1 (E.D. Cal. July 9, 2018). This timely appeal followed.

## STANDARD OF REVIEW AND JURISDICTION

We review a district court's denial of a preliminary injunction for abuse of discretion. *Epona v. County of Ventura*, 876 F.3d 1214, 1219 (9th Cir. 2017). "Our review is limited and deferential. The district court's interpretation of the underlying legal principles, however, is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam). We will therefore reverse a denial of a preliminary injunction if the district court "based [its decision] on an erroneous legal standard or a clearly erroneous finding of fact." *Associated Press v. Otter*, 682 F.3d 821, 824 (9th Cir. 2012) (quoting *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012)).

We have jurisdiction over the United States' appeal of the denial of its motion for a preliminary injunction pursuant to 28 U.S.C. § 1292.[5]

## ANALYSIS

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*

---

[5] The United States' notice of appeal is directed to both the district court's preliminary injunction order *and* its order granting in part and denying in part California's motion to dismiss. Although we have appellate jurisdiction over appeal of the preliminary injunction order pursuant to 28 U.S.C. § 1292(a)(1) (conferring jurisdiction over "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions"), we do *not* have jurisdiction over an appeal of the dismissal order. Since the district court did not grant California's motion to dismiss in its entirety, that order was not a "full adjudication of the issues" and did not "clearly evidence[] the judge's intention that it be the court's final act in the matter," *Nat'l Distrib. Agency v. Nationwide Mut. Ins. Co.*, 117 F.3d 432, 433 (9th Cir. 1997) (quoting *In re Slimick*, 928 F.2d 304, 307 (9th Cir. 1990)), and therefore was not final pursuant to 28 U.S.C. § 1291. *See Prellwitz v. Sisto*, 657 F.3d 1035, 1038 (9th Cir. 2011) ("[T]he district court's order was not final because it did not dispose of the action as to *all* claims between the parties."). Indeed, it is quite clear that the order was not the court's final act in the matter, since it subsequently granted the United States' motion to stay further proceedings pending the outcome of this appeal. *See United States v. California*, No. 2:18-cv-00490-JAM-KJN, 2018 WL 5310675, at *1 (E.D. Cal. Oct. 19, 2018).

The district court did not certify the non-final dismissal order pursuant to Federal Rule of Civil Procedure 54(b) or 28 U.S.C. § 1292(b), and no other apparent exceptions to the finality rule exist here. We therefore **DISMISS** the appeal of the district court's dismissal order for want of appellate jurisdiction.

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Here, as the United States observes, the district court's "sole basis for denying injunctive relief against the California laws at issue in this appeal was the court's assessment of the merits," which, it further argues, "was erroneous because the district court adopted an unduly narrow view of two related doctrines, intergovernmental immunity and conflict preemption."

The doctrine of intergovernmental immunity is derived from the Supremacy Clause, U.S. Const., art. VI, which mandates that "the activities of the Federal Government are free from regulation by any state." *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014) (quoting *Mayo v. United States*, 319 U.S. 441, 445 (1943)). "Accordingly, state laws are invalid if they 'regulate[] the United States directly or discriminate[] against the Federal Government or those with whom it deals.'" *Id.* (alterations in original) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion)).

Under the doctrine of conflict preemption, "state laws are preempted when they conflict with federal law. This includes cases where 'compliance with both federal and state regulations is a physical impossibility,' and those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona II*, 567 U.S. at 399 (citations omitted) (first quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963); and then quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). The latter instances constitute so-called "obstacle preemption," and "[t]o determine whether obstacle preemption exists, the Supreme Court has instructed that we employ our 'judgment, to be informed by examining the

federal statute as a whole and identifying its purpose and intended effects.'" *United States v. Arizona* (*Arizona I*), 641 F.3d 339, 345 (9th Cir. 2011) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)), *aff'd in part, rev'd in part*, 567 U.S. 387 (2012). The Court has emphasized that "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.' . . . [A] high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 110–11 (1992) (Kennedy, J., concurring in part and concurring in the judgment)).

"Under these principles," the United States contends, "the challenged provisions of California law are invalid and should have been enjoined." We consider each statute in turn.

## I.  AB 450

AB 450, which imposes penalties on employers based on their interactions with federal immigration authorities, was partially enjoined by the district court; specifically, its provisions relating to employers who provide consent to federal investigations or reverify the employment eligibility of current employees. The district court did not, however, enjoin the provisions of AB 450 that establish employee-notice requirements. The United States maintains that "these provisions violate the intergovernmental immunity doctrine and are also subject to obstacle preemption."

Congress enacted the IRCA to combat the employment of unauthorized noncitizens. *Arizona II*, 567 U.S. at 404–05. Employers are required to retain documentation regarding employees' work authorizations, and to make that documentation available for inspection by federal officers. 8 U.S.C. § 1324a(b)(3). Such inspections must be preceded by "at least three business days notice." 8 C.F.R. § 274a.2(b)(2)(ii). The United States notes that "[n]either the statute nor the regulations require any notice to employees before their employers' records are inspected, or after an inspection is conducted." AB 450, by contrast, requires two forms of notice: first, employers must inform their employees of upcoming inspections within 72 hours of receiving notice, Cal. Lab. Code § 90.2(a)(1), and second, employers must share any documents providing the results of the inspection with any employees who might lack work authorization, *id.* § 90.2(b)(1)–(2).

## A. Intergovernmental Immunity

The United States contends that "AB 450's provisions impermissibly target and discriminate against federal immigration enforcement operations." It reasons that "[i]f any other entity—such as a state or federal regulator, or a private entity—inspects an employer's records, the employer would have no obligation under AB 450 to notify its employees," and thus that AB 450 impermissibly imposes a "unique regime" on the federal government.

This argument, however, extends intergovernmental immunity beyond its defined scope. The doctrine has been invoked, to give a few examples, to prevent a state from imposing more onerous clean-up standards on a federal hazardous waste site than a non-federal project, *Boeing*, 768 F.3d at 842–43; to preclude cities from banning only the U.S. military and its agents from recruiting minors, *United*

*States v. City of Arcata*, 629 F.3d 986, 988, 990–92 (9th Cir. 2010); and to foreclose a state from taxing the lessees of federal property while exempting from the tax lessees of state property, *Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 381–82, 387 (1960).  Those cases dealt with laws that directly or indirectly affected the operation of a federal program or contract.  The situation here is distinguishable—AB 450 is directed at the conduct of *employers*, not the United States or its agents, and no federal activity is regulated.  We agree with California: "The mere fact that those notices contain information about federal inspections does not convert them into a burden on those inspections."  Similarly, the mere fact that the actions of the federal government are incidentally *targeted* by AB 450 does not mean that they are incidentally *burdened*, and while the latter scenario might implicate intergovernmental immunity, the former does not.  As the district court correctly recognized, to rule otherwise "would stretch the doctrine beyond its borders."  *California I*, 314 F. Supp. 3d at 1097.

The United States argues that the proposition that intergovernmental immunity is only implicated when federal activities are obstructed "is clearly wrong, because it would render the intergovernmental-immunity doctrine entirely redundant with the obstacle-preemption doctrine, which separately addresses the *burdensome effect* of *non-discriminatory* state laws."  We disagree.  The United States does not accurately distinguish between the doctrines of intergovernmental immunity and obstacle preemption. Reviewing the case law in which these doctrines were developed yields the proper distinction: simply put, intergovernmental immunity attaches only to state laws that discriminate against the federal government and burden it in some way.  Obstacle preemption, by contrast, attaches to any

state law, regardless of whether it specifically targets the federal government, but only if it imposes an obstructive, not-insignificant burden on federal activities.

Moreover, the United States' position that no obstruction is required in intergovernmental immunity cases ignores the origins of the doctrine and the occasions in which it has been applied. "The doctrine of intergovernmental immunity arose from the Supreme Court's decision in *M'Culloch v. Maryland*, which established that 'the states have no power, by taxation or otherwise, *to retard, impede, burden, or in any manner control*, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government.'" *City of Arcata*, 629 F.3d at 991 (emphasis added) (citation omitted) (quoting *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819)); *see also North Dakota*, 495 U.S. at 437–38 (plurality opinion) ("The nondiscrimination rule finds its reason in the principle that the States *may not directly obstruct* the activities of the Federal Government." (emphasis added)); *Washington v. United States*, 460 U.S. 536, 544 (1983) ("The important consideration . . . is not whether the State differentiates in determining what entity shall bear the legal incidence of the tax, but whether the tax is discriminatory with regard to the *economic burdens that result*." (emphasis added)); *City of Arcata*, 629 F.3d at 991 (applying the nondiscrimination rule to ordinances that "specifically target *and restrict* the conduct of military recruiters" (emphasis added)).

Since the advent of the doctrine, intergovernmental immunity has attached where a state's discrimination negatively affected federal activities in some way. It is not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment.

The Supreme Court has clarified that a state "does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington*, 460 U.S. at 544–45. AB 450 does not treat the federal government worse than anyone else; indeed, it does not regulate federal operations at all. Accordingly, the district court correctly concluded that AB 450's employee-notice provisions do not violate the doctrine of intergovernmental immunity.

### B. Preemption

The United States also contends that AB 450's employee-notice provisions are preempted because they seek "to alter the manner in which the federal government conducts inspections, by imposing requirements that neither Congress nor the implementing agency saw fit to impose." We disagree. The cases to which the United States cites concerned either the disruption of a federal relationship or the undermining of a federal operation. Here, there is indisputably a federal relationship, but it is between federal immigration authorities and the employers they regulate[6]— *not* between employers and their employees. AB 450 impacts the latter relationship, not the former, and imposes no additional or contrary obligations that undermine or disrupt the activities of federal immigration authorities. In *Arizona II*, the Supreme Court observed that a "[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." 567 U.S. at 406

---

[6] *Cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law.").

(alteration in original) (quoting *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 287 (1971)); *see also Crosby*, 530 U.S. at 376–77 (finding preempted a state law "imposing a different, state system" that "undermines the President's intended statutory authority"). Here, by contrast, there is no "conflict in technique," because federal activity is not regulated.

AB 450's employee-notice provisions do not permit employers to hire individuals without federally defined authorization, or impose sanctions inconsistent with federal law, either of which *would* impermissibly "frustrate[] the purpose of the national legislation or impair[] the efficiency of those agencies of the Federal government." *Nash v. Fla. Indus. Comm'n*, 389 U.S. 235, 240 (1967) (quoting *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896)). But "nothing in IRCA (or federal immigration policy generally) demands that employers, site owners, or general contractors be absolved from" a state's employee-protection efforts "whenever undocumented aliens provide labor." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 242 (2d Cir. 2006); *see also id.* at 241–42 (finding no preemption where "[t]here is no irreconcilable conflict between IRCA and [a state workplace-protection law] such that compliance with both the former's prohibition on the employment of undocumented workers and the latter's safe construction site obligation is physically impossible"). In the absence of irreconcilability, there is no conflict preemption, as the district court correctly recognized. *See California I*, 314 F. Supp. 3d at 1097.

## II.  AB 103

AB 103 authorizes the California Attorney General to inspect detention facilities that house civil immigration detainees. The United States contends that the law

"impermissibly seeks to require facilities housing federal immigration detainees to cooperate with broad investigations that examine the due process provided to detainees and the circumstances surrounding the detainee's apprehension and transfer to the facility." Again, it invokes intergovernmental immunity and obstacle preemption.

## A. Intergovernmental Immunity

Like AB 450, AB 103 relates exclusively to federal conduct, as it applies only to "facilities in which noncitizens are being housed or detained for purposes of civil immigration proceedings in California." Cal. Gov't Code § 12532(a).[7] Unlike AB 450, AB 103 imposes a specialized burden on federal activity, as the district court recognized. *See California I*, 314 F. Supp. 3d at 1093. That vital

---

[7] To "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), the INA contemplates use of both federal facilities *and* nonfederal facilities with which the federal government contracts. *See id.* § 1231(g)(2) (requiring the federal government to "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for" detainee detention); *id.* § 1103(a)(11) (authorizing "payments" to and "cooperative agreement[s]" with states and localities). For purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988) ("[A] federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation."); *Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437, 438–41 (9th Cir. 1991) (holding that state licensing requirements for construction contractors were preempted to the extent that they applied to federal contractors).

distinction renders the burdensome provisions of AB 103 unlawful under the doctrine of intergovernmental immunity.

Prior to the enactment of AB 103, California law already required periodic inspections of prisons and detainment facilities. *See* Cal. Penal Code § 6031.1 (mandating biennial inspections of "[h]ealth and safety," "[f]ire suppression preplanning," "[s]ecurity, rehabilitation programs, recreation, treatment of persons confined in the facilities, and personnel training," and visitation conditions, as well as the completion of subsequent reports). AB 103, however, does not merely replicate this inspection scheme; in addition to requiring "[a] review of the conditions of confinement," the enactment also calls for reviews of the "standard of care and due process provided to" detainees, and "the circumstances around their apprehension and transfer to the facility." Cal. Gov't Code § 12532(b)(1). These additional requirements burden federal operations, and *only* federal operations.[8]

---

[8] The statute requires that the California Attorney General "be provided all necessary access for the observations necessary to effectuate reviews required pursuant to this section, including, but not limited to, access to detainees, officials, personnel, and records." Cal. Gov't Code § 12532(c). Immigration and Customs Enforcement (ICE) official Thomas Homan claimed that "[t]hese inspections have caused the facilities to expend resources otherwise necessary for ensuring the safety and security of the detainees. Each inspection presents a burdensome intrusion into facility operations and pulls scarce resources away from other sensitive law enforcement tasks." Homan also attested that "the broad allowances made by AB 103 for the California [Attorney General] to perform reviews of immigration detention facilities to include wide-ranging access to facilities, individuals, and records, if enforced by the state, will conflict with ICE's ability to comply with other federal information disclosure laws, regulations, and policies."

The district court addressed this burden as follows: "[The United States] argues the law violates [the doctrine of intergovernmental immunity] because it imposes a review scheme on facilities contracting with the federal government, only. This characterization is valid. However, the burden placed upon the facilities is minimal and [the United States'] evidence does not show otherwise." *California I*, 314 F. Supp. 3d at 1093. Instead of challenging the factual conclusion regarding the severity of AB 103's burden, the United States questions the district court's legal conclusion, contending that "the application of the intergovernmental immunity doctrine does not depend on the size of the discriminatory burden imposed. Even a tax of $1 imposed only on entities that contract with the federal government would be unlawful." In essence, the district court applied a de minimis exception to the doctrine of intergovernmental immunity, concluding that a discriminatory enactment is lawful so long as the burden it imposes on the federal government is minimal. But the court cited no authority for this proposition. We must therefore determine whether such an exception is cognizable.

### i. De Minimis Exception

We agree with the United States that Supreme Court case law compels the rejection of a de minimis exception to the doctrine of intergovernmental immunity.

The recent decision in *Dawson v. Steager*, 139 S. Ct. 698 (2019), supports this position. There, the Court suggested that *any* discriminatory burden on the federal government is impermissible, writing that "[s]ection 111 disallows *any* state tax that discriminates against a federal officer or employee." *Id.* at 704 (citing 4 U.S.C. § 111). The Court had previously explained that the prohibition against discriminatory taxes in § 111 "is coextensive with the

prohibition against discriminatory taxes embodied in the modern constitutional doctrine of intergovernmental tax immunity." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 813 (1989).

The parties do not dispute that the principles of the intergovernmental tax immunity doctrine apply to the general intergovernmental immunity doctrine. *See North Dakota*, 495 U.S. at 434–39 (plurality opinion). Accordingly, we are not prepared to recognize a de minimis exception to the doctrine of intergovernmental immunity. *Any* economic burden that is discriminatorily imposed on the federal government is unlawful.[9] In relying on a de minimis exception, the district court applied incorrect law and therefore abused its discretion.

### ii. Burdensome Provisions

That is not to say, however, that the United States is likely to succeed on the merits as to the *entirety* of AB 103. Only those provisions that impose an additional economic

---

[9] We note the practical merit of this conclusion. Rejecting a de minimis exception permits a clearer distinction between intergovernmental immunity and the related—but distinct—doctrine of obstacle preemption. Intergovernmental immunity is implicated when *any* burden is imposed exclusively on the federal government; obstacle preemption is implicated when an *obstructive* burden is imposed, regardless of its discriminatory nature. Our conclusion is also consistent with *M'Culloch*, the seminal intergovernmental immunity decision. There, the Supreme Court was loath to undertake the "perplexing inquiry, so unfit for the judicial department, what degree of taxation is the legitimate use, and what degree may amount to the abuse of the power," and opined that "[a] question of constitutional power can hardly be made to depend on a question of more or less." *M'Culloch*, 17 U.S. (4 Wheat.) at 327, 430.

burden exclusively on the federal government are invalid under the doctrine of intergovernmental immunity.

California maintains that all of AB 103's requirements duplicate preexisting inspection demands imposed on state and local detention facilities. It points to regulations requiring its Board of State and Community Corrections (the Board) to inspect not only compliance with general health and safety standards—which are included in AB 103, *see* Cal. Gov't Code § 12532(b)(1)(A)–(B) (requiring review of "the conditions of confinement" and "the standard of care" of detainees)—but also the availability of legal reference materials and confidential communications with counsel. *See* Cal. Penal Code § 6031.1; Cal. Code Regs. tit. 15, §§ 1063–64, 1068. California argues that AB 103's requirement that the California Attorney General review the "due process provided to" civil immigration detainees, Cal. Gov't Code § 12532(b)(1)(B), is therefore duplicative, on the assumption that "due process" refers to "conditions of confinement that affect detainees' ability to access courts— such as the adequacy of the facility's law library, the availability of unmonitored communications with counsel, and the ability to send and receive mail." *See Bounds v. Smith*, 430 U.S. 817, 828 (1977) (recognizing that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law"); *Cornett v. Donovan*, 51 F.3d 894, 897–98 (9th Cir. 1995) (finding that the *Bounds* right is "not limited to people who are committed following criminal proceedings"). At oral argument, California maintained that its Attorney General's interpretation of "due process" is indeed as limited as its brief suggests, and thus does not compel any additional

inspection requirements beyond those applied to other state facilities.

In the context of this appeal from the denial of a preliminary injunction, we accept California's limited construction. We therefore conclude that AB 103's due process provision likely does not violate the doctrine of intergovernmental immunity, and that the district court's denial of a preliminary injunction as to this provision should be affirmed. We note, however, that a broader reading of the term "due process" might empower the California Attorney General to scrutinize, say, an immigration judge's analysis, the results of the Board of Immigration Appeals, or other related court proceedings—all of which are well outside the purview of a state attorney general, and not duplicative of the inspection requirements otherwise imposed on California's state and local detention facilities.

That is not the end of our inquiry, for as the United States observes, California "does not even attempt to identify any provision of the pre-existing inspection scheme analogous to the unique requirement for immigration detainees that inspectors must examine the circumstances surrounding their apprehension and transfer to the facility." *See* Cal. Gov't Code § 12532(b)(1)(C). This is a novel requirement, apparently distinct from any other inspection requirements imposed by California law. The district court was therefore incorrect when it concluded that "the review appears no more burdensome than reviews required under California Penal Code §§ 6030, 6031.1." *California I*, 314 F. Supp. 3d at 1093.

In light of this apparent factual error, and the district court's erroneous reliance on a de minimis exception to the doctrine of intergovernmental immunity, we reverse the district court's denial of a preliminary injunction as to

California Government Code section 12532(b)(1)(C)—the provision of AB 103 requiring examination of the circumstances surrounding the apprehension and transfer of immigration detainees.

## B.  Preemption

The United States further argues that "even if AB 103's inspection regime had not discriminatorily targeted facilities holding federal immigration detainees, it still would be preempted by federal law." We disagree.

The cases on which the United States relies involved a far clearer interference with federal activity than AB 103 creates. In *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189–90 (1956) (per curiam), and *Gartrell Construction Inc. v. Aubry*, 940 F.2d 437, 441 (9th Cir. 1991), states prevented the federal government from entering into agreements with its chosen contractors until the states' own licensing standards were satisfied. In *Tarble's Case*, the Supreme Court rejected a state court's attempt to discharge a prisoner held "by an officer of the United States, under claim and color of the authority of the United States, as an enlisted soldier mustered into the military service of the National government." 80 U.S. (13 Wall.) 397, 412 (1871). In *In re Neagle*, the Court determined that a county sheriff could not hold a U.S. marshal on murder charges for actions taken on duty. 135 U.S. 1, 62 (1890).

These cases evinced states' active frustration of the federal government's ability to discharge its operations. Here, by contrast, AB 103 does not regulate whether or where an immigration detainee may be confined, require that federal detention decisions or removal proceedings conform to state law, or mandate that ICE contractors obtain a state license. The law might require some federal action to permit

inspections and produce data—a burden that, as discussed above, implicates intergovernmental immunity—but as California persuasively notes, "[M]ere collection of such factual data does not (and cannot) disturb any federal arrest or detention decision."

In *Arizona II*, the Supreme Court noted that "[i]n preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" 567 U.S. at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The United States does not dispute that California possesses the general authority to ensure the health and welfare of inmates and detainees in facilities within its borders, and neither the provisions of the INA that permit the federal government to contract with states and localities for detention purposes, *see* 8 U.S.C. §§ 1103(a)(11), 1231(g), nor the contracts themselves,[10]

---

[10] The contracts included in the record *require* that immigration facilities conform to California's authority. One contract—between DHS and the City of Holtville, California, for use of the Imperial Regional Detention Facility—includes a provision requiring "compl[iance] with all applicable ICE, federal, state and local laws, statutes, regulations, and codes. In the event there is more than one reference to a safety, health, or environment requirement . . . the most stringent requirement shall apply." Another agreement between the Office of the Federal Detention Trustee and a private contractor, Corrections Corporation of America, to house ICE detainees in San Diego County similarly required that "[a]ll services and programs shall comply with . . . all applicable federal, state and local laws and regulations." The district court correctly recognized these provisions, writing, "The Court finds no indication in the cited portions of the INA that Congress intended for States to have no oversight over detention facilities operating within their borders. Indeed, the detention facility contracts [California] provided to the Court expressly contemplate compliance with state and local law." *California I*, 314 F. Supp. 3d at 1091 (citations omitted).

demonstrate *any* intent, let alone "clear and manifest," that Congress intended to supersede this authority.  The district court was correct when it concluded, "Given the Attorney General's power to conduct investigations related to state law enforcement—a power which [the United States] concedes—the Court does not find this directive in any way constitutes an obstacle to the federal government's enforcement of its immigration laws or detention scheme." *California I*, 314 F. Supp. 3d at 1091–92 (citation omitted).

## III.  SB 54

We now reach the most contentious of the three challenged laws, SB 54, which, the United States contends, "seeks to impede the enforcement of federal immigration laws by manipulating the overlap between state criminal enforcement and federal immigration enforcement."

### A.  Preemption

The United States argues that SB 54 unlawfully obstructs the enforcement of federal immigration laws.  It focuses on a provision of the law that prohibits California law enforcement agencies from "[t]ransfer[ring] an individual to immigration authorities unless authorized by a judicial warrant or judicial probable cause determination."  Cal. Gov't Code § 7284.6(a)(4).  It notes that the INA provides that "[o]n a warrant issued *by the Attorney General*, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a) (emphasis added).  It therefore concludes that "California has no authority to demand a judicial warrant that Congress chose not to require. . . .  By prohibiting transfers of custody within secure areas of local jails in the absence of a judicial warrant, California prevents federal

officers from obtaining custody through a safe and peaceful transfer."

We have no doubt that SB 54 makes the jobs of federal immigration authorities more difficult. The question, though, is whether that constitutes a "[c]onflict in technique" that is impermissible under the doctrine of obstacle preemption. *Arizona II*, 567 U.S. at 406 (alteration in original).

The United States relies in part on our opinion in *Oregon Prescription Drug Monitoring Program v. DEA*, 860 F.3d 1228 (9th Cir. 2017), but that case is easily distinguished. There, a federal agency issued statutorily authorized subpoenas to a state agency, and the latter sought a declaration that it need not respond because of a state statute requiring "a valid court order" in all cases in which a subpoena is issued. *Id.* at 1231–32, 1236. We concluded that the state statute "stands as an obstacle to the full implementation of the [federal statute] because it 'interferes with the methods by which the federal statute was designed to reach [its] goal.'" *Id.* at 1236 (second alteration in original) (quoting *Gade*, 505 U.S. at 103 (plurality opinion)). Here, by contrast, neither an administrative warrant issued by federal authorities nor any other provision of law identified by the United States *compels* any action by a state or local official. With the exception of § 1373(a), discussed below, the various statutory provisions to which the United States points direct *federal* activities, not those of state or local governments. *See* 8 U.S.C. §§ 1226, 1231.

We cannot simply assume that Congress impliedly mandated that state and local governments would act in accordance with these statutes. Even if Congress had every expectation that they would, and opted not to codify its belief based on the presumption that states would conduct their law

enforcement activities in concert with federal immigration efforts, it is a state's historic police power—not preemption—that we must assume, unless clearly superseded by federal statute. *See Arizona II*, 567 U.S. at 400.[11]  As California notes, "There is [] nothing in the federal regulatory scheme requiring States to alert federal agents before releasing a state or local inmate."  The Fifth Circuit has aptly noted that

> [f]ederal law does not suggest the intent—let alone a "clear and manifest" one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement. Section 1357 does not require cooperation at all.  And the savings clause allowing cooperation without a 287(g) agreement indicates that some state and local regulation of cooperation is permissible.

*City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) (citations omitted) (citing 8 U.S.C. § 1357(g)(9)–(10)).[12]

---

[11] A state's ability to regulate its internal law enforcement activities is a quintessential police power. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

[12] The United States points out that *City of El Cenizo* "upheld a state enactment that merely required state and local officials to cooperate with requests by federal officials," as opposed to California's efforts "*to disrupt* the federal scheme."  But this distinction does not alter the Fifth Circuit's conclusion regarding the ability of states and localities to regulate the extent to which they cooperate with federal immigration authorities.

In short, SB 54 does not directly conflict with any obligations that the INA or other federal statutes impose on state or local governments, because federal law does not actually mandate any state action (again, with the exception of § 1373, discussed below).

But that does not resolve the lingering issue of obstacle preemption. The United States notes that SB 54 requires federal officers to, "in effect, stake out a jail and seek to make a public arrest. . . . Arrests of aliens in public settings generally require five officers and present risks to the arresting officer and the general public." It contends that "Congress did not contemplate that, as a consequence of letting state detention proceed first, federal officers who sought to detain an alien for immigration purposes would need to race to the front of a local detention facility and seek to effectuate an arrest before the alien manages to escape." Compounding the problem, the United States further claims, are provisions of SB 54 that preclude agencies from providing personal information and release dates to immigration authorities. *See* Cal. Gov't Code § 7284.6(a)(1)(C)–(D). "So not only would California require DHS to stake out jails to detain aliens upon their release," the United States continues, "but California would require DHS to do so indefinitely because the agency would not otherwise know if and when any given alien would be released."

The district court concluded that this frustration does not constitute obstacle preemption:

> California's decision not to assist federal immigration enforcement in its endeavors is not an "obstacle" to that enforcement effort. [The United States'] argument that SB 54 makes immigration enforcement far more

> burdensome begs the question: more
> burdensome than what? The laws make
> enforcement more burdensome than it would
> be if state and local law enforcement
> provided immigration officers with their
> assistance. But refusing to help is not the
> same as impeding. If such were the rule,
> obstacle preemption could be used to
> commandeer state resources and subvert
> Tenth Amendment principles.

*California I*, 314 F. Supp. 3d at 1104.**[13]** We agree. Even if SB 54 obstructs federal immigration enforcement, the United States' position that such obstruction is unlawful runs directly afoul of the Tenth Amendment and the anticommandeering rule.

## B. The Tenth Amendment and Anticommandeering Rule

"The Constitution . . . 'confers upon Congress the power to regulate individuals, not States.'" *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018) (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)). Under the Tenth Amendment and other provisions of the Constitution, "the Federal Government may not compel the States to

---

**[13]** The Seventh Circuit has conducted a similar analysis: "[T]he Attorney General repeatedly characterizes the issue as whether localities can be allowed to thwart federal law enforcement. That is a red herring. . . . [N]othing in this case involves any affirmative *interference* with federal law enforcement at all, nor is there any interference whatsoever with federal immigration authorities." *City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018), *vacated in part on other grounds*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018).

implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997).

Ultimately, we conclude that the specter of the anticommandeering rule distinguishes the case before us from the preemption cases on which the United States relies. Those cases concerned state laws that affirmatively disrupted federal operations by mandating action (or inaction) contrary to the status quo.[14] In each, a state statute

---

[14] *See Arizona II*, 567 U.S. at 393–94 (considering four provisions of state law, including "[t]wo [that] create new state offenses" and two that "give specific arrest authority and investigative duties with respect to certain aliens to state and local law enforcement officers"); *Crosby*, 530 U.S. at 366 ("The issue is whether the Burma law of the Commonwealth of Massachusetts, restricting the authority of its agencies to purchase goods or services from companies doing business with Burma, is invalid under the Supremacy Clause of the National Constitution owing to its threat of frustrating federal statutory objectives." (footnote omitted)); *Lockridge*, 403 U.S. at 276 (exploring "the extent to which the maintenance of a general federal law of labor relations combined with a centralized administrative agency to implement its provisions necessarily supplants the operation of the more traditional legal processes in this field"); *Nash*, 389 U.S. at 236 ("The crucial question presented here is whether a State can refuse to pay its unemployment insurance to persons solely because they have preferred unfair labor practice charges against their former employer."); *Paul*, 373 U.S. at 133–34 (assessing a state statute that "gauge[d] the maturity of avocados by oil content," where federal law "gauge[d] the maturity of avocados grown in Florida by standards which attribute no significance to oil content"); *Hines*, 312 U.S. at 59 ("This case involves the validity of an Alien Registration Act adopted by the Commonwealth of Pennsylvania."); *Davis*, 161 U.S. at 283 (determining that "an attempt, by a State, to define [the] duties or control the conduct of [the] affairs [of national banks] is absolutely void, wherever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation or impairs the efficiency of these agencies of the Federal government to discharge the

affirmatively instituted a regulatory scheme that conflicted with federal law, either by commission (for example, by applying differing standards or mandating affirmative action irreconcilable with federal law) or omission (by demanding inaction that directly conflicted with federal requirements). The solution to avoid conflict preemption was the same: invalidate the state enactment. In each case, the status quo would return—either no future conflicting action would be taken, or active compliance with federal law would recommence—and federal activity would no longer be obstructed.

Here, by contrast, invalidating SB 54 would *not* prevent obstruction of the federal government's activities, because the INA does not require any particular action on the part of California or its political subdivisions. Federal law provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities. SB 54 simply makes that choice for California law enforcement agencies.

The United States' primary argument against SB 54 is that it forces federal authorities to expend greater resources to enforce immigration laws, but that would be the case *regardless* of SB 54, since California would still retain the ability to "decline to administer the federal program." *New York*, 505 U.S. at 177. As the Supreme Court recently rearticulated in *Murphy*, under the anticommandeering rule, "Congress cannot issue direct orders to state legislatures," 138 S. Ct. at 1478, and the Court's earlier decision in *New*

---

duties, for the performance of which they were created"). *Leslie Miller*, *Gartrell Construction*, *Tarble's Case*, and *Neagle* featured similarly affirmative disruptions of federal law; their specific facts are explored in our discussion of AB 103 and preemption.

*York* underscored that the rule also permits a state's refusal to adopt preferred federal policies. *See* 505 U.S. at 161–62. Even in the absence of SB 54, Congress could not "impress into its service—and at no cost to itself—the police officers of the 50 States." *Printz*, 521 U.S. at 922.**[15]**

Federal schemes are inevitably frustrated when states opt not to participate in federal programs or enforcement efforts. But the choice of a state to refrain from participation cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal. Extending conflict or obstacle preemption to SB 54 would, in effect, "dictate[] what a state legislature may and may not do," *Murphy*, 138 S. Ct. at 1478, because it would imply that a state's otherwise lawful decision *not* to assist federal authorities is made unlawful when it is codified as state law.

We also find no constitutional infirmity in the specific provisions of SB 54 that govern the exchange of information with federal immigration authorities. *See* Cal. Gov't Code § 7284.6(a)(1)(C)–(D) (prohibiting California law enforcement agencies from "[p]roviding information regarding a person's release date or responding to requests for notification by providing release dates or other information unless that information is available to the

---

**[15]** The United States suggests that these principles do not extend here because "both sovereigns [are] regulat[ing] private individuals," and the Supreme Court has held that it "is incorrect" to "assume that the Tenth Amendment limits congressional power to pre-empt or displace state regulation of private activities affecting interstate commerce." *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289–90 (1981). But although the INA and SB 54 both implicate noncitizens—private actors—SB 54 governs how California and its localities can interact with the federal government, not the activities of private individuals, and so *Hodel* is inapposite.

public," and "[p]roviding personal information . . . about an individual, including, but not limited to, the individual's home address or work address unless that information is available to the public"). These two subparts only concern the exchange of information, and the Supreme Court has implied the existence of a Tenth Amendment exception for reporting requirements. *See Printz*, 521 U.S. at 917–18 (distinguishing between federal statutes that "require only the provision of information to the Federal Government" and those that "force[ the] participation of the States' executive in the actual administration of a federal program").

The United States relies on *Reno v. Condon*, which upheld against Tenth Amendment attack a federal statute that "regulate[d] the disclosure and resale of personal information contained in the records of state DMVs" because it did "not require the States in their sovereign capacity to regulate their own citizens" and instead "regulate[d] the States as the owners of data bases." 528 U.S. 141, 143, 151 (2000). But the Supreme Court recently explained,

> The anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage.
>
> That principle formed the basis for the Court's decision in *Reno v. Condon*, which concerned a federal law restricting the disclosure and dissemination of personal information provided in applications for driver's licenses. The law applied equally to state and private actors. It did not regulate

the States' sovereign authority to "regulate their own citizens."

*Murphy*, 138 S. Ct. at 1478–79 (citation omitted) (quoting *Reno*, 528 U.S. at 151). Here, by contrast, it is the state's responsibility to help enforce federal law, and not conduct engaged in by both state and private actors, that is at issue. We therefore conclude that *Murphy*'s reading of *Reno* suggests that the latter is not applicable here.

SB 54 may well frustrate the federal government's immigration enforcement efforts. However, whatever the wisdom of the underlying policy adopted by California, that frustration is permissible, because California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts. The United States stresses that, in crafting the INA, Congress expected cooperation between states and federal immigration authorities. That is likely the case. But when questions of federalism are involved, we must distinguish between expectations and requirements. In this context, the federal government was free to *expect* as much as it wanted, but it could not *require* California's cooperation without running afoul of the Tenth Amendment.

## C.  Intergovernmental Immunity

The Government also argues that SB 54 violates the doctrine of intergovernmental immunity.

The district court correctly rejected that argument. *See California I*, 314 F. Supp. 3d at 1110. In *North Dakota*, the Supreme Court endorsed "a functional approach to claims of governmental immunity, accommodating of the full range of each sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the

National and State Governments." 495 U.S. at 435 (plurality opinion). A finding that SB 54 violates the doctrine of intergovernmental immunity would imply that California *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule.

### D.  Section 1373

Lastly, the United States contends that 8 U.S.C. § 1373 directly prohibits SB 54's information-sharing restrictions.

Section 1373 provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). SB 54, in turn, expressly *permits* the sharing of such information, and so does not appear to conflict with § 1373. *See* Cal. Gov't Code § 7284.6(e) ("This section does not prohibit or restrict any government entity or official from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of an individual . . . pursuant to Section[] 1373."). But the United States argues that § 1373 actually applies to more information than just immigration status, and hence that SB 54's prohibition on sharing *other* information creates a direct conflict.

We disagree. Although the United States contends that "whether a given alien may actually be removed or detained by federal immigration authorities is, at a minimum, information regarding that alien's immigration status," the phrase "information regarding the citizenship or

immigration status, lawful or unlawful, of any individual" is naturally understood as a reference to a person's legal classification under federal law, as the district court concluded. *See California I*, 314 F. Supp. 3d at 1102 ("[T]he plain meaning of Section 1373 limits its reach to information strictly pertaining to immigration status (i.e. what one's immigration status is) and does not include information like release dates and addresses.").**[16]** Phrases like "regarding" may generally have "a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject," *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759–60 (2018), but if the term "regarding" were "taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-

---

**[16]** This is consistent with our decision in *Steinle v. City and County of San Francisco*, in which we determined that "[t]he statutory text [of § 1373(a)] does not include release-date information. It includes only 'information regarding' 'immigration status,' and nothing in [§ 1373(a)] addresses information concerning an inmate's *release date*." No. 17-16283, slip op. at 16 (9th Cir. Mar. 25, 2019). Several district courts have reached similar conclusions regarding § 1373's circumscribed scope. *See, e.g.*, *City and County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 968 (N.D. Cal. 2018) ("Given my interpretation of Section 1373, limiting it to information relevant to citizenship or immigration status not including release date information, it is clear [SB 54] complies with Section 1373."), *appeal docketed*, No. 18-17308 (9th Cir. Dec. 4, 2018); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 333 (E.D. Pa. 2018) ("The phrase 'citizenship or immigration status,' plainly means an individual's category of presence in the United States—e.g., undocumented, refugee, lawful permanent resident, U.S. citizen, etc.— and whether or not an individual is a U.S. citizen, and if not, of what country. The phrase 'information regarding' includes only information relevant to that inquiry. When an individual will be released from a particular City facility, cannot be considered 'information regarding' his immigration status."), *aff'd in part, vacated in part on other grounds sub nom. City of Philadelphia v. Attorney Gen.*, 916 F.3d 276 (3d Cir. 2019).

emption would never run its course, for '[r]eally, universally, relations stop nowhere.'" *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (alteration in original) (quoting H. James, *Roderick Hudson* xli (New York ed., World's Classics 1980)).**[17]**

Congress has used more expansive phrases in other provisions of Title 8 when intending to reach broader swaths of information. *See, e.g.*, 8 U.S.C. § 1360(a) (mandating the inclusion of "such other relevant information as the Attorney General shall require as an aid" to the creation of a central index of noncitizens entering the country); *id.* § 1360(b) ("Any information in any records kept by any department or agency of the Government as to the identity and location of aliens in the United States shall be made available to the Service upon request."). The United States claims that § 1373*(c)* demonstrates the extensive reach of § 1373*(a)*, as unlike the latter, the former does not use the term "regarding" but instead refers simply and explicitly to "the citizenship or immigration status of any individual." *Id.* § 1373(c). But the fact that subpart (c) only concerns itself with immigration status suggests, given § 1373's focus on reciprocal communication between states and the federal government, that immigration status is the extent of subpart (a)'s reach as well.**[18]**

---

**[17]** Indeed, the range of facts that might have some connection to federal removability or detention decisions is extraordinarily broad. *See, e.g.*, 8 U.S.C. § 1182 (listing various admissibility considerations, including vaccination history, education, financial resources, and membership in "the Communist or any other totalitarian party").

**[18]** We note that a congressional report concerning a statute with similar language to § 1373 indicated that it "provides that no State or

The United States also relies heavily on an Information Bulletin issued by the California Department of Justice in June 2014, which read in part that "law enforcement officials may provide information to ICE, including notification of the date that an individual will be released, as requested on an immigration detainer form.  Federal law provides that state and local governments may not be prohibited from providing information to or receiving information from ICE."  The United States contends that California's "limited view of the scope of [§ 1373] contradicts the longstanding views . . . of the California Attorney General."  But the Information Bulletin attempted to summarize both federal law *and* California's then-governing TRUST Act, not the laws at issue today.   And at any rate, the previous conclusions of the California Attorney General do not change the plain text and meaning of § 1373; that the California Department of Justice might have been incorrect *then* does not mean that its revised interpretation is incorrect *now*.

In summation, the district court correctly concluded that "Section 1373 and the information sharing provisions of SB

---

local government entity shall prohibit, or in any way restrict, any entity or official from sending to or receiving from the [federal government] information regarding the immigration status of an alien or the presence, whereabouts, or activities of illegal aliens."  H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 2649, 2771.  But the fact that the report distinguished between the two categories—"information regarding the immigration status of an alien *or* the presence, whereabouts, or activities"—suggests that "information regarding the immigration status" does *not* include "the presence, whereabouts, or activities" of noncitizens.   And in any event, "Congress's 'authoritative statement is the statutory text, not the legislative history.'"  *Whiting*, 563 U.S. at 599 (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)).

54 do not directly conflict." *California I*, 314 F. Supp. 3d at 1104.**[19]**

## IV.    *Winter* Factors

California argues that the three other *Winter* factors—irreparable harm, the balance of the equities, and the public interest, 555 U.S. at 20—provide an alternative basis for affirming the district court's denial of a preliminary injunction. *See Big Country Foods, Inc. v. Bd. of Educ.*, 868 F.2d 1085, 1088 (9th Cir. 1989) (concluding that a district court's denial of a motion for a preliminary injunction "may [be] affirm[ed] on any ground supported by the record"). Because we agree with the district court that the United States is unlikely to succeed on the merits of its challenges to AB 450's employee-notice provisions and SB 54, we consider these factors only as applied to the provision of AB 103 that imposes an impermissible burden on the federal government.

In granting the United States' motion to enjoin the two invalidated provisions of AB 450, the district court "presume[d] that [the United States] will suffer irreparable harm based on the constitutional violations." *California I*, 314 F. Supp. 3d at 1112. This conclusion was consistent with our previous recognition that preventing a violation of

---

**[19]** Because we agree with the district court's conclusion, we need not address whether § 1373 is itself unlawful, though we note that various district courts have questioned its constitutionality. *See, e.g.*, *City and County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 949–53 (N.D. Cal. 2018), *appeal docketed*, No. 18-17308 (9th Cir. Dec. 4, 2018); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 873 (N.D. Ill. 2018); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 329–31 (E.D. Pa. 2018), *aff'd in part, vacated in part on other grounds sub nom. City of Philadelphia v. Attorney Gen.*, 916 F.3d 276 (3d Cir. 2019).

the Supremacy Clause serves the public interest. *See, e.g.*, *Arizona I*, 641 F.3d at 366 ("We have found that 'it is *clear that it would not be equitable or in the public's interest to allow the state* . . . to violate the requirements of federal law, especially when there are no adequate remedies available. . . . In such circumstances, the interest of preserving the Supremacy Clause is paramount.'" (alterations in original) (quoting *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852–53 (9th Cir. 2009))); *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059–60 (9th Cir. 2009) (determining that "the balance of equities and the public interest [] weigh in favor of a preliminary injunction" against a likely preempted ordinance).

Nevertheless, California argues that "[t]he balance of equities and public interest weigh strongly against enjoining [its] laws during the pendency of litigation" because "a preliminary injunction here would lead to significant, concrete harm to the public." At the district court, California claimed that "the Legislature passed AB 103 in reaction to growing concerns of egregious conditions in facilities housing civil detainees," *California I*, 314 F. Supp. 3d at 1090–91—a conclusion supported in detail by amici curiae, including the National Health Law Program and the Immigrant Legal Resource Center. Moreover, we note that California retains an historic—and, since the federal government's contracts with immigration detainee facilities explicitly contemplate the application of state regulations, undisputed—authority to regulate the conditions of detainees housed within its borders. By contrast, other than relying on general pronouncements that a Supremacy Clause violation alone constitutes sufficient harm to warrant an injunction, the United States did not present compelling evidence that AB 103 inspections conducted by the

California Attorney General harmed facilities' detention operations. Rather, the *only* evidence of AB 103's burdensome effect is conclusory assertions made by a DHS official in a declaration and deposition.[20] Neither he nor the United States provided any indication, even an estimate, of the actual costs imposed by AB 103 or the number of ICE officers forced to assist in the extra inspection efforts, or any quantification whatsoever of the enactment's burden. The United States' complaint in this action did not even plead that the statute imposes an economic or operational burden on DHS or anyone else.

We are not prepared, in the first instance, to affirm the district court's denial of a preliminary injunction as to

---

[20] The relevant deposition transcript reads as follows:

> [I]t's going to require yet another inspection that we think is unnecessary, because these are federal contracts, these are federal prisoners detained under federal authority. We have our own set of standards. We certainly don't believe there should be any inspections to talk about due process of people that are in federal custody, under federal authority, conditions of confinement when we have our own set of standards which is much higher than most states.

> So there's this general feeling that this is—it's burdensome, that they're going to be required to pull resources to do these inspections, when we have numerous inspections already at these facilities from various different components.

> So again, it's—it's talk of burdensomeness—right?— extra work, pulling people from their duties to host these things and gather documents and paperwork and making people available for interviews and so forth.

AB 103's burdensome provision based on these considerations. However, on remand, we encourage the district court to reexamine the equitable *Winter* factors in light of the evidence in the record.

## CONCLUSION

We conclude that the district court correctly determined that the United States was unlikely to succeed on the merits of its challenges to AB 450's employee-notice provisions and SB 54, and therefore AFFIRM its denial of a preliminary injunction as to these enactments. We also AFFIRM the denial as to those provisions of AB 103 that duplicate preexisting inspection requirements. But because we conclude that California Government Code section 12532(b)(1)(C) both discriminates against and impermissibly burdens the federal government, we REVERSE the district court's denial of the United States' motion as to this provision and REMAND for further proceedings consistent with this opinion.[21]

---

[21] Finally, we grant the State of Michigan's motion to withdraw from an amicus brief in support of the United States.